# APPEAL OF PATRICK SHEA ET AL.
## [SUSAN SHEA v. PATRICK SHEA, ET AL.]

FROM THE DECREE OF THE COURT OF COMMON PLEAS OF LUZERNE COUNTY.

Argued April 12, 1888—Decided October 1, 1888.

1. Where in a bill in equity an informal averment is made of a fact of which no proof is necessary to make out the plaintiff's case, and such fact is set up formally in the defendant's answer as a bar to the plaintiff's relief, in such case the rule that a responsive answer is evidence of itself to be overcome by the counter testimony of two witnesses, etc., has no application, and the burden of proving the fact affirmatively remains with the defendant.

2. A decree in equity will not be reversed on account of the refusal of the master and the court below to re-open the case after the taking of the testimony was closed, argument heard, and report made, in order that a party may have an opportunity to prove matters, of which he had knowledge and the means and opportunity of proof at the time of the hearing.

3. Where, in a proceeding by a widow for the assignment of dower, there is interposed as a defence an ante-nuptial contract executed the day of the marriage in release of all the plaintiff's rights in the estate of her future husband, the burden is upon the defendants to follow the proof of the contract by sufficient affirmative evidence that no advantage was taken of the confidential relation, and that the contract was executed by the plaintiff with a full knowledge of its provisions and of their effect.

Before GORDON, C. J., PAXSON, GREEN, CLARK and WILLIAMS, JJ.; TRUNKEY and STERRETT, JJ., absent.

No. 200 January Term 1888, Sup. Ct.; court below, No. 1 January Term 1886, C. P.

On November 30, 1885, Susan Shea, filed a bill in equity against Patrick Shea, Ellen Smoulter and John Smoulter, her husband, and Mary A. Smith and Joseph Smith, her husband. The bill averred that the plaintiff was the widow of Thomas Shea, deceased, to whom she had been married on September 27, 1884, and paragraph 3 was as follows:

3. That after she had agreed to marry him and on the day

of the wedding he proposed to her to sign a paper, as he said, to satisfy his children; that she is illiterate, not able to read or write, and, under the representations of said Shea, she was induced to make her mark to a paper which she has not seen since that time and has no means of producing, but which she now believes contained an agreement by her with said Shea for the payment to her of a monthly sum after his death; that she then would not have signed the said paper had she understood its contents.

The bill then proceeded to set out, that, after the marriage, the said Thomas Shea had abused and ill-treated the plaintiff and finally had driven her from his house, with threats that he would take her life if she remained; that, thereupon, the plaintiff had instituted proceedings in the Court of Quarter Sessions to compel her husband to support her, and he had been sentenced by the court to pay her an allowance of $40 per month beginning May 8, 1885, none of which had ever been paid; that, pending the said proceedings, the said Thomas Shea had conveyed all his real estate, fully described in the bill, to the defendants, each conveyance in consideration of $1 and natural love and affection, and had also transferred to them by gift all his personal estate; that said Thomas Shea had died on October 12, 1885, intestate, and without making any provision for the plaintiff, and letters of administration had been granted to her, but she had been unable to obtain anything belonging to his estate; that on November 21, 1885, the plaintiff had made demand of defendants for the assignment of her dower in the lands described and for the delivery to her of the said personal estate, which demand had been refused; praying for a decree, (1) assigning her dower and, (2) for discovery.

The 3d section of the answers, a separate one being filed by Patrick Shea, inter alia averred, in response to the 3d section of the bill, that "the plaintiff previous to her marriage with said Thomas Shea, on September 27, 1884, knowingly and after a careful consideration of its contents, did enter into an antenuptial contract or agreement with the said Thomas Shea, founded upon a sufficient consideration, duly signed and sealed by the parties thereto," and made a part of the bill, whereby the plaintiff relinquished all right of dower and all interest of whatsoever kind in the estate of said Thomas Shea, to which

she might become entitled by reason of the marriage, and whereby it was further agreed that the said Thomas Shea should retain the entire control and exclusive ownership of all his estate and the right to dispose of the same at his option; and it was denied that the plaintiff would not have signed the said agreement had she fully understood its contents, but, on the contrary, the plaintiff had willingly executed the same after being fully informed of its nature and contents, and after a careful consideration by her of its provisions and their effect.

The cause having been put at issue by replication, was referred to *Mr. G. R. Bedford*, as examiner and master, who heard the testimony and on July 20, 1886, submitted his report to the counsel concerned for examination and exception. Thereupon *Mr. McCartney*, of counsel for the defendants, filed an affidavit that he was absent when Mr. James L. Lenahan was called and examined before the examiner and he had assumed that the witness would testify that, before the ante-nuptial contract was drawn, he had fully explained its proposed tenor to Mrs. Shea, and that, after it was drawn and before she signed it, he had read it to her and had fully explained all its provisions to her, and that she signed it thoroughly understanding and comprehending its effect; that the affiant did not know that Mr. Lenahan had not so testified until after the taking of the testimony had closed; that the affiant did not ask the examiner to re-open the case and allow the facts referred to to be shown, because he doubted the authority of the examiner so to do, and because he assumed as matter of law that when Mrs. Shea signed the contract she must be presumed to know and be acquainted with its contents; that on further investigation the affiant was convinced that in so acting he had committed an error which might work great injustice to his clients, inasmuch as Mr. Lenahan would testify to the facts stated. The affidavit of Mr. James L. Lenahan was also filed, setting forth the facts to which he would testify in proof that the contract had been read to Mrs. Shea, and that she was fully informed of and fully comprehended its provisions and their effect when she signed it. Upon these affidavits, application was made, to re-open the taking of testimony, to permit the testimony of Mr. Lenahan to be taken.

Master's Report. °

On August 14, 1886, the master filed his report, the excep-
tions thereto, and his supplementary report disposing of the
same. The report was as follows:

In ascertaining the facts the master has directed his inquiry
to matters preceding the marriage, and as the result thereof he
reports the following findings of fact.

1. Susan Shea, the plaintiff, formerly Susan Murphy, being
at the time a widow of mature years, was engaged in business
on her own account, in a small way, but yielding sufficient for
her support.

2. During August, 1884, Thomas Shea, then a widower of
some seventy years of age, and the father of the principal de-
fendants in this case, from time to time visited her and urged
her to marry him, promising her a comfortable home and an
easier life, with certain incidental advantages. His offer of
marriage was finally accepted and the day agreed upon for the
wedding.

3. At that time, Thomas Shea was worth some $75,000, in
personal and real estate, and on September 25, 1884, called on
the plaintiff and in a general way stated that he was worth
$75,000 or $80,000, that he was unwilling to give any woman
one third of it at his time of life, but his intended wife would
in case she survived him have a good home, and he would agree
in addition to leave her $30 per month; he therefore proposed
that they go to a lawyer and have a paper to that effect drawn
up. The plaintiff declined to agree to this arrangement in
quite indignant terms, remarking that she didn't hold herself
so cheap, or words to that effect. Thereupon the parties imme-
diately separated, Mr. Shea going to his home in Nanticoke.

4. Two days later, being September 27, 1884, said Thomas
Shea and the plaintiff were duly married; but, an hour or so
prior thereto, and amid preparations for going to the church to
have the wedding ceremony performed, James L. Lenahan, Esq.,
an attorney of this bar, appeared at the house of the plaintiff,
having already drawn up the ante-nuptial agreement mentioned
in the bill and the several answers, and printed as an appendix
to the latter, and which recites the intended marriage between
the said Thomas Shea and Susan Murphy, and an agreement
that, from and after the solemnization of said marriage, the

ownership and control of all the property belonging to Thomas Shea should continue and remain his exclusive property, and to be disposed of by him without the assent or approbation of the said Susan Murphy, and she relinquishing all right of dower and all interest of every kind whatever in his estate : in consideration whereof said Thomas Shea covenanted to pay or cause to be paid to the said Susan Murphy, the sum of $30 per month from the day of his death, so long as she should survive him and remain his widow, the same to be secured on his real estate. This paper was signed by the parties with their respective marks, and was prepared at the instance and in behalf of Thomas Shea. While it does not appear that he directly employed Mr. Lenahan, yet it is clear that the latter was not employed by the plaintiff, and under the circumstances must be held to have been acting for Mr. Shea in the business.

5. The plaintiff is unable to read or write, and it does not appear that the agreement was read over or explained to her, nor does it appear that the plaintiff asked to have the same read, or made any inquiries in relation thereto. It is testified by one witness for the plaintiff that, the paper being the subject of conversation, Mr. Shea said that " he did not want his children to cheat Mrs. Murphy out of anything after he died ; that he wanted her to have a good living." It is urged that this testimony, coupled with the fact that the plaintiff had previously declined to sign such a paper is sufficient to warrant the further finding of fact : that plaintiff was induced to sign the paper by the representation of Thomas Shea, that it was to secure her against being wronged by his children. It is possible that the testimony quoted and the circumstances attending plaintiff's refusal, should be regarded as the equivalent of two witnesses requisite to warrant the finding of fact asked for, as against the denials of the answer ; but, as the disposition of the case is hereafter put on other grounds, the master does not deem it necessary to decide the question.

6. In February, 1885, plaintiff caused the arrest of Thomas Shea for desertion and failure to furnish her support, of which he was subsequently convicted and sentenced to pay her $40 per month ; but meanwhile, and during the pendency of said proceeding, he conveyed and transferred all his real and personal estate to his children, as stated in the bill, in considera-

tion of their agreement to pay $35 per month each for his support during life, but whether paid or not does not appear. The real purpose of said conveyance was, as the master concludes, to defeat the plaintiff in her attempt to fix upon Thomas Shea the responsibility for her support, and even ignored her right to have the $30 per month named in the ante-nuptial agreement secured on his real estate.

7. Thomas Shea died on October 12, 1885, having made no further provision for his wife.

Upon the facts as found, the master, discussing Greenfield's Est., 14 Pa. 489 ; Penn. R. Co. v. Shay, 82 Pa. 198 ; Geiger v. Welsh, 1 R. 349 ; Sanders v. Wagonseller, 19 Pa. 248 ; Johnston v. Harvy, 2 P. & W. 82, concluded as matter of law that the ante-nuptial agreement was not binding upon the plaintiff, and was to be disregarded, and further that the conveyances to the children were voluntary and subject to the plaintiff's rights as widow, recommending a decree granting the first prayer of the bill at the costs of the defendants.

The defendants' exceptions were, to wit :

1. To the 5th finding of fact, to wit : that it does not appear that the ante-nuptial contract was read over and explained to the plaintiff. The 3d section of the defendants' answers are responsive to the averments of the bill on this subject; and its effect has not been overcome, nor has it been answered by any testimony offered by the plaintiff or to be found anywhere in the case.[1]

2. To the 6th finding of fact, to wit : that the conveyances by Thomas Shea to his children were for the purpose of defeating the plaintiff's right to support, and to ignore her rights under the ante-nuptial contract.[2]

3. To the conclusion of law that the ante-nuptial agreement is not binding upon the plaintiff, and is therefore to be disregarded.[3]

4. To the conclusion of law that the conveyances to the children are voluntary, and subject to the plaintiff's rights as widow.[4]

5. To the report, as unsupported by the evidence in the case and as contrary to the evidence.[5]

6. To the decree recommended.[6]

7. To the refusal to allow James L. Lenahan to testify in the case according to the written application of the defendants, notwithstanding the taking of the testimony by the examiner had closed.[7]

The master's report on the exceptions was as follows :

Having considered the several exceptions filed by the plaintiff and the defendants, I conclude not to change my report. In reference to the defendants' 7th exception it is proper to briefly state the facts. After my report was made up, and before the exceptions were drawn up, the counsel for defendants made application to me to take further testimony as examiner, and to recall James L. Lenahan, Esq., basing such application on the affidavits of said Lenahan and Gen. McCartney, herewith submitted. My functions as examiner having closed when the testimony was closed, I had and have, as such, no power to reopen the case and recall witnesses, or compel their attendance or the attendance of parties. I am equally clear that as master I have no power to send the case back to the examiner. This power is lodged only in the court, which has full control of the proceeding. I therefore declined to consider the application, and the same is one for the court to deal with.

The said exceptions having been renewed upon the filing of the reports, after argument, the court, RICE, P. J., on March 7, 1887, filed the following opinion and order :

The prominent question raised by the exceptions is as to the burden of proof. We agree with the defendants' counsel, that, in so far as the bill alleges actual fraud as a ground of relief against the contract in question, the burden of proof rests on the plaintiff, and, the answer being responsive, it was incumbent on her to establish her allegations by the testimony of two witnesses, or of one witness and corroborating circumstances. On the other hand, the rule as to the burden of proof is the same at law as in equity; in both, the party maintaining the affirmative of the issue has it cast upon him. And, though the answer is responsive in form, yet if it involves also affirmatively the assertion of a right in opposition to the plaintiff's demand, it is but mere pleading and is not sufficient to establish the right so asserted : 3 Greenl. Ev. § 287 ; 2 Daniel Ch. 841. If, therefore, it can be shown that the allegations of the answers

are affirmative in their nature,—if, though there be not sufficient proof of actual fraud and misrepresentation, yet, from the nature of the contract, the facts alleged are essential to its validity as a bar to the relief prayed for, and are not to be presumed, the answer being replied to is of no avail in respect to such allegations, and the defendants were as much bound to establish them by independent testimony as the plaintiff was to sustain the essential averments of the bill.

Whenever two persons stand in such a relation that, while it continues, confidence is necessarily imposed by one, and the influence which necessarily grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, although the transaction could not have been impeached if no such confidential relation had existed. Not only so, but there can be no contract between the two, except after the fullest and fairest explanation and communication of every particular resting in the breast of the one who seeks to establish the contract with the person so trusting him : Bispham's Eq., § 232. These principles apply to a variety of relations, such as those of guardian and ward, attorney and client, trustee and cestui que trust, principal and agent, and husband and wife. They also apply to the relation of persons betrothed, and the rule that such persons owe to each other the greatest good faith may be invoked to set aside secret ante-nuptial settlements in fraud of the marital rights of either, as well as ante-nuptial contracts between the parties, where there is concealment of circumstances materially bearing on the contemplated agreement: Kline v. Kline, 57 Pa. 120. To the same effect are Kline's Est., 64 Pa. 122; Tiernan v. Binns, 92 Pa. 248; Bierer's Appeal, 92 Pa. 265. We agree that such contracts are not to be regarded with disfavor. They come in conflict with no policy of the law and are not to be viewed with the same degree of suspicion as voluntary donations: Tiernan v. Binns, supra; Ludwig's Appeal, 101 Pa. 535. As a general rule the scrutiny in cases of gifts is more severe and searching than in those of contracts: Bispham's Eq. § 231; and, in contracts of this nature, as already suggested, it may perhaps be presumed

in the first instance that full disclosures were made. But this is not the ordinary presumption in favor of the validity of contracts between persons dealing at arms' length; for, as a general rule, where the relations of the parties are such as imply a condition of superiority held by one of the parties over the other, there, in every transaction between them by which the superior party obtains a possible benefit, equity raises a presumption against its validity, and casts upon that party the burden of proving affirmatively its compliance with equitable requisites, and of thereby overcoming the presumption: Pomeroy's Eq. J., § 956, 957 ; 2 Daniel Ch., 850. Owing to the near connection between the parties, in many relations, the transaction in itself is considered so suspicious as to cast the burden of proof upon the person who seeks to support it, to show that he has taken no advantage of his influence or knowledge, and that the arrangement is fair and conscientious: " Darlington's Appeal, 86 Pa. 512. Such is decided to be the case where the provisions secured for the wife in an ante-nuptial contract are unreasonably disproportionate to the means of the intended husband: Kline's Est., supra; Bierer's Appeal, supra. If, therefore, there is ever a prima facie presumption of his good faith and of her full knowledge, and independent consent and action, it seems to us, that, in order to harmonize this class of cases with the general principles of law, as to contracts between persons occupying fiduciary relations, the presumption must be regarded as one of fact arising from the adequacy of the provision made for her, as compared with the intended husband's means, rather than one of law arising from her execution of the instrument. At all events, the presumption, if there be one, in favor of the validity of the instrument may be overcome, and the burden of proof cast on the defendant, by circumstances which would be entirely inadequate to avoid an ordinary contract on the ground of actual and intended fraud.

Here, it is true, any presumption of a designed concealment by Thomas Shea of his means is rebutted by the testimony. But full disclosures by him, in this regard, did not constitute his whole duty. In view of the circumstance under which this paper was executed, of the plaintiff's inability to read or write, and of the fact that she had no legal adviser, we think it was his duty, in addition, to see that she knew the nature and

effect of the action she was about to take. When we consider further that but a short time before she had indignantly refused to enter into a contract upon terms equally if not more favorable than those contained in this paper, and that there is no independent testimony that she had in the meantime changed her mind, we do not think it would be in accordance with the principles we have been discussing, to presume that the contents of the instrument were fully made known to her, that she understood its effect, and that she was under no constraint when she executed it. We think the learned master could not, under the evidence before him, do otherwise than conclude " that the validity of the ante-nuptial agreement between Thomas Shea and this plaintiff cannot be sustained, in the absence of proof that she knew the actual contents of the paper, the effect of which would be, if enforced, to accomplish precisely what two days before she had refused to assent to." Are there such affirmative proofs? Rose Virtue says : " On the afternoon before they went to the church Mr. James L. Lenahan came to Mrs. Murphy's house and was up-stairs in the sitting-room with her and Mr. Shea. I heard them talking about some paper that Mr. Lenahan was to write and Mrs. Murphy to sign. Mr. Shea said he did not want his children to cheat Mrs. Murphy out of anything after he died; that he wanted her to have a good living. There was no other lawyer there but Mr. Lenahan. Shortly after he left they went to the church." This is the only evidence of what took place at the time the paper was executed; and, while it tends to show that the paper was not prepared when Mr. Lenahan appeared at the plaintiff's house, it does not, in our opinion, show affirmatively that its contents were made known, and its real purpose and effect fully explained to her. On the other hand, we do not think it would be safe to infer from the single remark shown to have been made by Thomas Shea that he actually misrepresented the purpose of the paper.

After the evidence was closed, the case argued before the master, and his report made up, the defendants' counsel made a motion based on affidavits, first to the master and afterwards to the court, to be permitted to recall James L. Lenahan to give further testimony. But in no view of the case can the proposed evidence be regarded as newly discovered. It is not

alleged that the counsel who was present and cross-examined Mr. Lenahan did not know of the facts which could be proved by him; on the contrary, the fair inference from all the circumstances is, that he did. Neither can the defendants allege surprise as a ground for re-opening the evidence, for at the time the case was argued before the master, the fact that Mr. Lenahan had not been asked to testify to the facts alleged in his affidavit, as well as the materiality of those facts, must have been known to them. The plaintiff's counsel asserts, and this is not controverted by the defendants' affidavits, that the point upon which the master ruled the case was then fairly raised and urged in the argument. If the defendants had up to that time been misled as to the grounds upon which the plaintiff based her claim for a decree, erroneously supposing that she relied solely upon the evidence of actual fraud and misrepresentations, they then had notice that she further claimed, that the onus probandi rested on them, and that she was entitled to a decree, notwithstanding the ante-nuptial contract, because they had not proved affirmatively that its contents had been fully made known and explained to her. Then, if not before, it became incumbent on them to decide whether they would rest the case on the evidence already in, or move to have permission to take this additional testimony. They could not, knowing of the evidence and its materiality, hold it in reserve until after the master had made up his report, without waiving their right to produce it. To hold otherwise would be to establish a rule of practice extremely dangerous, contrary to all principle, and one which we have been able to find no precedent to justify or even excuse: See Nece v. Pruden, 8 Phila. 350; Freeman v. Stine, 13 Phila. 28.

And now, March 7, 1887, the exceptions to the master's report are overruled and the report is confirmed. The counsel for the plaintiff is requested to draw a formal decree in accordance with the recommendations of the master and submit it for approval as provided in § 79, Rule XIV.

Under a formal decree drawn as ordered and signed, that the plaintiff was dowable and entitled to dower in and out of the lands described in the bill, and that she should have assignment thereof, etc., the master, to whom said assignment was referred,

proceeded after testimony taken, to assign and set out particular lands and tenements, as and for the plaintiff's dower, which should be of the annual rental value equal to one third of the rental value of all lands described in the bill, and to take an account of the rents and profits of said lands, since the death of Thomas Shea, received by the defendants, or for their use, one third of which should be paid by the defendants to the plaintiff, etc.; and, on the coming in of his report the same was confirmed, and a final decree signed in accordance with its recommendations. Thereupon the defendants, excepting, took this appeal, specifying that the court erred, inter alia:

1–7. In dismissing the defendants' exceptions.[1 to 7]

12. In holding that the validity of the ante-nuptial contract could not be sustained in the absence of proof that Mrs. Shea knew the actual contents of the paper.

13. In holding that the defendants were as much bound to establish the averments of the answer, by independent testimony, as the plaintiff was to sustain the essential averments of the bill.

*Mr. W. H. McCartney* and *Mr. John T. Lenahan*, for the appellants:

1. The plaintiff does not allege fraud or mistake in her signing of the ante-nuptial contract; she alleges that she cannot read, and that she signed the contract not understanding its contents. That she could not read, and did not ask any one to read for her, would not afford her protection: Greenfield's Est., 14 Pa. 496. But the defendants answered that she knew just what she was about when she signed the contract; and, while these answers may be mere pleadings, they are of import in the case: Greenfield's Est., 14 Pa. 497; Tiernan v. Binns, 92 Pa. 248. The rule of law on the subject is well known. If the defendant's answer be responsive to the bill, it will require two witnesses, or one witness and strong corroborating circumstances to overcome it; but if the answer set up different matter from that alleged in the bill, the burden of proving it is on the defendant: Pusey v. Wright, 31 Pa. 387. What different matter is there to be found in the defendants' answer to the main feature of the bill? The plaintiff alleged that she would not have signed the contract had she understood it.

The defendants answered that she did understand it; they simply deny; broadly and comprehensively it is true, but their answer is only a denial of the plaintiff's allegation.

2. The citation by the learned judge below of 3 Greenl. Ev. § 287, and 2 Daniel's Chancery, 841, is text-book law based on certain cases of which Pusey v. Wright, 31 Pa. 387, is a leading Pennsylvania case, and the law on the subject as declared in that case is, that there is no difference in respect to the burden of proof between proceedings at law and in equity; in both, the party maintaining the affirmative of the issue has it cast upon him, and when the answer is responsive to the bill it is evidence for the defendant which the plaintiff must overcome by the counter evidence of two witnesses or of one witness and strong circumstances in corroboration, otherwise it will prevail. The operation of the defendant's answer is the same, though the equity of the bill is grounded on the allegation of fraud: Eberly v. Groff, 21 Pa. 256; Audenreid's App., 89 Pa. 120; Lamotte v. Cook, 15 Beav. 240; Hoghton v. Hoghton, 15 Beav. 299; Ludwig's App., 101 Pa. 539. The cases relied upon by the master and court below are clearly distinguishable.

3. While the master expressly declares that he does not base his action on this ground, he finds in his 6th finding of fact, that the real purpose of the conveyances to the children was to defeat the plaintiff in her attempt to fix on him the responsibility for her support, and he concludes as a matter of law that the conveyances were voluntary. This finding of fact was not warranted by any of the facts in the case. In the cases cited by the master, Geiger v. Welsh, 1 R. 349, Sanders v. Wagonseller, 19 Pa. 248, Johnston v. Harvy, 2 P. & W. 82, the grantors being insolvent conveyed away all their estates, without a valuable consideration. In this case there was no indebtedness on the part of the grantor, the grantees were purchasers for a valuable consideration, and the facts were clearly within Wilson v. Howser, 12 Pa. 109; Posten v. Posten, 4 Wh. 27; Hennon v. McClane, 88 Pa. 219.

4. It may be, that the refusal of the court below to allow James L. Lenahan to be recalled, was entirely within the discretion of that court and not reviewable here. But, if it so be that this case is an exception to the general rule and if the grantees of Thomas Shea are bound to a higher standard of

duty than commonly obtains, then it would seem they should not have been shut off from a full and complete demonstration of their proof.

*Mr. Henry W. Palmer*, for the defendant in error:

1. The claim of the appellant was for dower at common law in her husband's estate. Her case was made out when she proved her marriage, the ownership of the property described in the bill during coverture, its conveyance without her joining in the deeds, and the death of her husband. The defence set up by the defendants, was an ante-nuptial contract of such a character as to discharge all her rights in her future husband's estate. The master and court held that in the case of such a contract, made between persons about to be married, the burden of proof was upon those who alleged the contract, to show that it had been fully understood and assented to by the other party. The authorities sustaining this position seem founded in sound reason and to be unalterably established: Bispham's Equity, §§ 230, 231, 232, 233 ; Kline v. Kline, 57 Pa. 122 ; Darlington's App., 86 Pa. 512 ; 2 Daniel's Chancery, 4th ed., 852 ; Hoghton v. Hoghton, 15 Beav. 234 ; Pomeroy's Eq. J., §§ 956, 957 ; Story's Eq. J., 308–12 ; Parshall's App., 65 Pa. 224 ; Spencer's App., 80 Pa. 317 ; Wistar's App., 54 Pa. 60 ; Miskey's App., 107 Pa. 630.

2. The case of the plaintiff was perfect without reference to or proof on the subject of the contract; all allusions to it might have been properly omitted from her bill. But the bill speaks of some kind of a paper which plaintiff then believed to have been an agreement to pay $30 per month, and there is nothing about releasing all claim to the estate of her future husband. This the answer avers affirmatively, and not by way of denial of anything averred in the bill as constituting the contract, and, further, that the contract was read and explained to her and that she signed it willingly. Surely this is new and affirmative matter material to the defence and therefore to be proved as such: 1 Daniel's Chancery, 4th ed., 836 ; Pusey v. Wright, 31 Pa. 387 ; Bellows v. Stone, 18 N. H. 465 ; Knickerbocker v. Harris, 1 Paige 208 ; Dugan v. Gitting, 3 Gill. 138.

3. Whether the conveyances to the children were voluntary, is of no special importance in the case, for the reason that if

the defendants were bona fide purchasers for value, as they claim, they could not on that ground successfully defend against a widow's dower: Reel v. Elder, 62 Pa. 308, 318.

OPINION, MR. JUSTICE GREEN:

It is true that the third paragraph of the plaintiff's bill contains an allegation that she had, on the day of her marriage, signed some paper which she believed contained an agreement for the payment to her by Shea of a monthly sum after his death. If this paper, though informally and incompletely averred as it is in the bill, was in part, or in whole, the basis of her claim for a decree and was essential to her right to have a decree, it would doubtless be incumbent upon her to establish it, and any averments she might make in respect to it or in respect to its validity would be subject to the ordinary rules of equity pleading. In this sense, she would be subject to the burden of proof, and would be bound by the rule that a responsive answer is evidence which must be overcome by the oaths of two witnesses or the oath of one witness and corroborating circumstances. But it is manifest upon the slightest consideration that the paper or agreement in question has nothing to do with the plaintiff's cause of action, is no part of it in any sense whatever, is not alleged or set up in the bill as being any part of her claim, and that its averment of it, or rather allusion to it, is the merest surplusage. No proof in relation to it on her part was necessary to be given in making out her case, and none was given except in rebuttal. The only way in which the antenuptial contract between the plaintiff and her husband comes into the case is by its averment as a defence in the answer. It is there described for the first time. It is set up by the defendants as a fact which precludes a recovery by the plaintiff. That particular contract was not asserted in the bill and hence the allegations of the answer respecting it do not bring it upon the record by way of response, but as new matter introduced as a defence. It cannot be doubted, therefore, that the burden of proof as to this contract rests upon the defendants, and that it must be established by proof and not by mere pleading.

It must be observed, moreover, that this is not a bill by the plaintiff to have a conveyance or contract set aside for fraud. No such decree is asked for and none such is necessary to the

plaintiff's right of recovery. The bill is simply one brought by a widow for the assignment of her dower. The only facts essential to her right to a decree are her marriage, the seisin of the husband during coverture, and the death of the husband. As to the subsequent alienation by the husband, it is no part of the plaintiff's case, and as it confers no rights which can of their own force deprive the plaintiff of her dower, its presence in the contention is really matter of history only and has no importance fundamental to the controversy. Its only real significance is in the determination of the parties to the suit as liable to be affected by the decree.

It will thus be seen that the limitations of the litigation and of the discussion here are much narrowed. In point of fact the plaintiff did execute a release of dower when she was sui juris, and it is obligatory upon her, unless there are sufficient legal or equitable reasons apparent on the record for denying it obligatory force. Before touching upon that subject it may be well to say that we do not feel at liberty to reverse the decree on account of the refusal of the master and the court below to re-open the case after the taking of testimony was closed, argument heard, and report made, in order that the defendants might have an opportunity to prove matters which they had the means and opportunity of proving on the hearing. The testimony was at that time in their knowledge and possession, its importance was just as manifest then as at the time of the application to re-open the case, and in the refusal of the master and court below to grant the application we can see no abuse of discretion, and, indeed, no error. We are entirely satisfied with the reasons given in the opinion of the court for declining to interfere.

There remains to consider only the status of the release of dower and its effect upon the plaintiff's right to a decree. We do not think it requires any proof of consideration, as the subsequent marriage was in itself sufficient consideration to support it. But we are clearly of opinion that this contract is justly amenable to the criticism and the ruling applied to it by the master and the learned court below. The reasoning contained in the opinion of the court is so clear and convincing that it is scarcely necessary to do more than say that it is exhaustive of the subject, and that we agree with it entirely. It is not the case

of a contract between strangers, or of persons dealing at arms' length. It is not even the case of a contract between persons in a confidential relation, but which, having been executed, carries with it the rights of one of the parties so that relief can only be obtained by an affirmative and adverse proceeding and decree setting it aside on the ground of actual fraud. The right of the plaintiff to her assignment of dower is complete without any reference to this contract. It comes into the case only as a defence against her claim, and the defendants must establish it not only as a factum, but as a bar to her claim not assailable either by legal or equitable principles. Viewed in this light it must endure successfully the test of those principles or it must fail. How is it in this respect? It is a contract between two persons, a man and a woman about to be married, and it relates to the future rights of the woman in the property of her husband. It is something to the purpose, though not of vital importance, that there was proof that two days before the marriage the plaintiff refused to sign such an agreement. True, she might have changed her mind and signed it nevertheless, but the duty to prove this and to prove it affirmatively, and by satisfactory testimony, rests upon the defendants, and on the face of this record there is no such proof.

There is, it is true, the legal inference of consent, which in all ordinary cases arises from mere execution. But in this class of cases that inference does not arise. The relation is one of such extreme mutual confidence that a special duty of full disclosure arises which has no place in the ordinary contractual relation. Thus, in the case of Kline v. Kline, 57 Pa. 120, we said: "There is perhaps no relation of life in which more unbounded confidence is reposed than in that existing between parties who are betrothed to each other. Especially does the woman place the most implicit trust in the truth and affection of him in whose keeping she is about to deposit the happiness of her future life. From him she has no secrets; she believes he has none from her. To consider such persons as in the same category with buyers and sellers, and to say that they are dealing at arms' length, we think is a mistake. Surely when a man and woman are on the eve of marriage, and it is proposed between them, as in this instance, to enter into an ante-nuptial contract upon the subject of the enjoyment and disposition of their respective

estates, it is the duty of each to be frank and unreserved in the disclosure of all circumstances materially bearing on the contemplated agreement." We held that the relation existing between betrothed persons was one of the confidential relations which require uberrima fides in all transactions between them. When this case came again before us in Kline's Est., 64 Pa. 122, after a hearing on the merits of the ante-nuptial agreement, we said, " While it might not be necessary to show affirmatively that there was a full disclosure of the property and circumstances of each, yet if the provision secured for the wife was unreasonably disproportionate to the means of the intended husband, it raised the presumption of designed concealment and threw upon him the burden of disproof."

The same doctrine was repeated in Tiernan v. Binns, 92 Pa. 248, and it was enforced against an unreasonable ante-nuptial agreement because there was no evidence showing a disclosure by the intended husband of the true state of his affairs. In the case of Darlington's Appeal, 86 Pa. 512, the rule was applied to a deed made by a married woman, shortly after marriage, whereby she conveyed her real estate to her husband. We held that a confidential relation exists between man and wife ; that where there are transactions between them courts will apply the same rules which govern dealings between attorney and client, principal and agent, guardian and ward, trustee and cestui que trust, and will require when the husband claims a benefit arising from any such dealings, that it be shown affirmatively that he acted in perfect good faith, and took no advantage of his influence or knowledge, and that whatever contracts he made were fair, adequate, and equitable. If no such proof is established, courts of equity will avoid his contracts on the ground of constructive fraud. The deed was set aside contrary to the report of the master and the decree of the court below, because there was no affirmative evidence that it was the purpose of the wife, free from her husband's undue influence, to give him the land, nor that his conduct was fair and conscionable. The foregoing cases were fully recognized and assented to in Ludwig's Appeal, 101 Pa. 535, but the doctrine was not applied because the facts of the case did not warrant it.

In Miskey's Appeal, 107 Pa. 611, we had occasion to review

at some length the subject of transactions between persons occupying a confidential relation to each other, and we there sustained a decree setting aside a voluntary conveyance made by a son to his father because there was no provision for the wife of the grantor, there was no power of revocation in the deed, and no affirmative proof showing that the absence of this power was known to the grantor, and for other reasons stated in the opinion. We fully recognized the exceptional character of this class of conveyances, and held the party claiming the benefit of the conveyance, to strict proof of good faith, that no advantage was taken of the confidential relation, and that the arrangement was fair and conscionable. In the case of Yardley v. Cuthbertson, 108 Pa. 395, we applied the doctrine to a scrivener, who wrote a codicil to the will of a decedent, and took a large benefit under the codicil. We held him bound to the necessity of giving affirmative proof that the testator was informed of and knew the extent of his estate and the proportion of it which would pass to the scrivener by the codicil, and that the testator's mind was free from undue influence exercised by the scrivener. The books abound with numerous cases in which the same rule has been applied, because of the confidential relation between the parties, and in which solemn conveyances and assurances have been set aside for want of the affirmative proof which the confidential relationship of the parties requires. We have seen that, under our own decisions, the relation of betrothed persons to each other comes within this category.

It remains only to be determined whether the facts of this case justify the application of the rule to its determination. There is evidence that there was some disclosure of the intended husband's property and circumstances to the plaintiff, before the marriage and the agreement. Under the testimony on this subject we could not find sufficient proof of a designed concealment on his part, and the contract could not be avoided on that ground. But it was also proved that two days before the marriage the plaintiff refused emphatically to sign an agreement quite as favorable as the one she did sign on the day of the marriage. It was proved she could neither read nor write, and there was no proof that the instrument was read or explained to her, and there was no affirmative proof that she had

knowledge of the contents of the paper she signed almost immediately before the marriage was celebrated. In addition to this, there was evidence of one witness which indicates that the paper then about to be signed may have been regarded by the plaintiff as a mere precaution against any undue advantage which might be taken by Mr. Shea's children after his death. It was a remark to that effect made by Shea himself immediately before the paper was executed. The proof scarcely amounts to evidence of a positive misrepresentation of the contents of the paper, but it is persuasive of a mistaken conception of it on her part. We agree with the learned court below, that the intended husband did not perform his whole duty when he obtained the signature of the plaintiff to the ante-nuptial agreement in question. It was to her a paper of the utmost consequence. It surrendered a large and most valuable property right which she was about to acquire. She had previously very positively refused to execute such a contract. It is not shown that she had changed her mind upon that subject, and it is not shown by any affirmative testimony either that she knew the contents of the paper, or that she had agreed to the terms of such a contract. Under all the decisions, she is in such a position as to entitle her to demand the adduction of such proof, before her otherwise perfectly established right to dower is taken from her. The contract is set up against her and not by her. Those who allege it must establish it, and they must do so in subservience and obedience to the rules which fix the character of the proof required in such cases and in such circumstances. This they have not done, and the result is that the plaintiff's plain legal right remains.

> Decree affirmed, and appeal dismissed at the cost of the appellants.