[S. F. No. 15319. In Bank.—May 1, 1936.]

CHARLES G. KELLY, Respondent, v. ALICE S. McCARTHY, Appellant.

Carroll S. Bucher, H. H. McPike and W. F. Mathewson for Appellant.

Walter H. Linforth, Wm. M. Cannon and Jesse H. Miller for Respondent.

SEAWELL, J.—This appeal is from a judgment invalidating certain separate bank deposits originally made by John J. Kelly in his name and which he afterwards transferred or changed into joint tenancy accounts in the name of himself and Alice S. McCarthy, payable to either of them or to the survivor, approximately two years before his demise. The question presented is whether the evidence, directly or inferentially, is sufficient to sustain the findings of the trial court to the effect that the appellant procured said transfers to be made by the exercise of undue influence and by the employment of fraudulent means practiced upon John J. Kelly, deceased, as found, or was guilty of procuring said assignments to be made by the employment of either of said means or methods.

John J. Kelly was a resident of the city and county of San Francisco on the day of his death, November 22, 1932. He was a widower, and left no child or children or the issue of

any child. Respondent claims that decedent was seventy-three years past at the time of his death, and appellant contends that he was under those years. The question as to his exact age is not material, as there is no evidence whatsoever that his mind was weakened by years or by any other cause. In fact, it is very clear from the evidence that he was mentally vigorous and alert to the end of his life, and none of the evidence offered at the trial tended in the slightest degree to prove mental incompetency. We do not understand that respondent relies upon the allegations of the complaint as to unsoundness of mind or mental incompetency on the part of decedent, but he in fact abandoned any attempt to support said allegations at the trial. He seems to rely for support of the judgment upon want of consideration and undue influence and fraud arising out of a confidential relation existing between the decedent and appellant by reason of an understanding that they were to be married, the time being contingent upon the happening of future events. The respondent, upon the case presented, is thrown entirely upon the rule announced in *Shea's Appeal,* 121 Pa. 302 [15 Atl. 629, 1 L. R. A. 422], which holds that "where a confidential relation exists (promise of marriage), and there is great opportunity for fraud, it is incumbent on the donee to show that the gift was not obtained by fraud or undue influence".

The suit was commenced by Charles G. Kelly, a brother of decedent, after request made by him of the special administrator, Bank of America National Trust and Savings Association, to bring suit, which request the special administrator refused to grant.

The decedent had been for some twenty-six years or more an employee, and latterly an inspector, in the service of the Market Street Railway Company. At the time of his death he was retired from active service and was receiving compensation as provided by the system of retirement. He and his wife were unquestionably persons of frugal habits, and decedent had been accustomed for many years to make deposits of his savings with the Hibernia Savings and Loan Society and the Bank of America National Trust and Savings Association. His wife predeceased him by nine or ten years.

In 1910 he opened a savings account with The Hibernia Savings and Loan Society, and in 1917 he opened a similar account with the Bank of America National Trust and Sav-

ings Association (Humboldt Bank Branch). Said savings accounts stood in his name. On February 19, 1931, he accompanied Mrs. McCarthy to each of said banks and closed his original accounts and caused the bank officials to open new accounts in which the moneys formerly in his individual name were credited in the new joint account to "John J. Kelly or Mrs. Alice S. McCarthy, payable to either or the survivor of either." The handwriting of decedent, together with his signature, appears upon the record cards and Mrs. McCarthy signed her name several times on the records of the transaction. It is the rule of banks, where deposits are made in joint names as was done in the instant case, to furnish keys to each of the joint tenants so that both tenants may have access to the box in which the papers of said parties are kept. There is no reason to doubt that the usual custom prevailed in the instant case and that a key was delivered to Mrs. McCarthy.

On February 19, 1931, the day said joint accounts were opened, there was on deposit in Mr. Kelly's name in the savings department of the Bank of America National Trust and Savings Association, $802.76. At the time of his death, November 22, 1932, it was reduced to $393.52. All withdrawals were made by him. On said February 19, 1931, John J. Kelly had on deposit with said The Hibernia Savings and Loan Society the sum of $2,205.49. On the day of his death, November 22, 1932, the joint deposit account of decedent and Mrs. McCarthy with said Savings and Loan Savings had increased from $2,205.49 to the sum of $3,671.15, totaling $4,064.67 on deposit with both banks. This amount does not include any interest which may have then been earned or which may have since been earned by said deposits.

The main charge upon which respondent relies to invalidate the transfers of said deposits or accounts into joint tenancy accounts is that decedent was of the belief and opinion that the relatives here claiming his property as heirs at law were at "enmity with him". It is not alleged that Mrs. McCarthy put such thoughts into his mind, but on the contrary, it is alleged that they originated with him, and she, well knowing that the beliefs and opinions of decedent in regard to his relatives were false, took advantage of his weakness of mind and the control and domination which she held over him, and caused him to be confirmed and fixed in said

beliefs which he had erroneously formed, and she thereby influenced him to execute the transfer of said accounts as above related. But, as above noted, we fail to find any evidence in the record which would support a finding as to the mental weakness or the incompetency of the decedent.

Mrs. McCarthy answered the complaint and denied all allegations which imputed or tended to impute fraud or undue influence on her part, and affirmatively alleged that the transfers of said accounts were the free and voluntary acts of the decedent, and that he was not at any time affected with any disability whatsoever.

The Bank of America National Trust and Savings Association in its answer denied that the $393.52 held by it in joint tenancy was a part of the estate of John J. Kelly, deceased. As a separate defense said bank alleged that on February 19, 1931, John J. Kelly had on deposit with it the sum of $802.76, and on said day said account was closed and said sum withdrawn by said John J. Kelly and on the same day he and Mrs. McCarthy opened a new bank account in the name of "John J. Kelly and/or Mrs. A. S. McCarthy as joint tenants," said account being payable to either of them, and that various withdrawals were made from said account, leaving the sum of $393.52 remaining in the joint names of John J. Kelly and/or Mrs. A. S. McCarthy.

The Hibernia Savings and Loan Society answered that on November 22, 1932, it had on deposit in an account standing in the name of "John J. Kelly or Alice S. McCarthy, payable to either or to the survivor of them" the sum of $3,671.15. All other allegations of the complaint going to the merits of the action are denied for want of information or belief.

Both banks disclaimed any interest in said deposits and asked leave to pay the amounts held by them into court for the use of the person or persons whom the court should determine were entitled to receive the same.

John J. Kelly was a native of Ireland and came to America as a very young man. He was vigorous mentally and physically and was devoted to the religion of his childhood. He was dependable and for some twenty-six or more years was an employee of the Market Street Railway and earned his right to retire upon compensation. He was unquestionably loyal to tried and deserving friends and sympathetic with and considerate of the unfortunate. He and Jeremiah Mc-

Carthy had been friends for forty years. Following the death of his wife, to whom he was greatly devoted, he became a frequent visitor at the McCarthy home. He often accompanied Mr. McCarthy from mass and other church services to the McCarthy home and their companionship was constant until terminated by the death of Mr. McCarthy in October, 1926. Shortly after the death of his wife, Mr. Kelly lived with his sister, Mrs. Hand, for a period, but as they could not live harmoniously in the same house, Mr. Kelly left and came to live with the McCarthys some three months before Mr. McCarthy died. He paid them $60 per month for his keep, the same amount he had paid his sister, Mrs. Hand, for similar accommodations. During the last illness of Mr. McCarthy, Mr. Kelly was constantly in attendance at his side, ministering to his personal comfort in every way that he was able to render service.

We have examined the evidence of the sixteen witnesses called by the respective parties and, taking the record by its four corners, we are of the view that it does not present sufficient reasons for denying to the decedent the right of disposing of his own at his will. Pertinent to the facts of the case is the rule expressed in *In re Kaufman's Estate*, 117 Cal. 288 [49 Pac. 192, 59 Am. St. Rep. 179]: "The right of absolute dominion over his property is sacred and inviolable and whatever may be his [testator's] motives or however great or unfounded his dislikes or his resentments against those who might be thought worthy of his bounty, his will in the disposition of his property is paramount. [Citing authorities.] 'The right of a testator to dispose of his estate depends neither on the justice of his prejudices nor the soundness of his reasoning. He may do what he will with his own, and if there be no defect of testamentary capacity, and no undue influence or fraud, the law gives effect to his will, though its provisions are unreasonable and unjust.' "

A will may not be set aside upon suspicion or because it does not conform to the ideas of others as to what was just or proper. (*In re McDevitt's Estate*, 95 Cal. 17 [30 Pac. 101]; *Estate of Smith*, 200 Cal. 152 [252 Pac. 325]; *Estate of Shay*, 196 Cal. 355 [237 Pac. 1079]; *Lobb* v. *Brown*, 208 Cal. 476 [281 Pac. 1010].)

We will not attempt a meticulous review of all the evidence, or attempt to reconcile conflicts or contradictions as to

matters which could not affect the final conclusion which naturally and inevitably follows as the only deduction that may be reasonably made from the controlling facts of the case, but we deem it proper to make reference at some considerable length to the important features of the case which directly shed light on the main question, to wit: Were the joint-deposit transactions of February 19, 1931, the result of a duly considered plan or purpose freely and voluntarily executed by decedent with a full appreciation of the relationship which existed between him on the one hand and the respective contending parties on the other, or were his acts the products of undue influence or fraud perpetrated on him by appellant? Our view is that there is no evidence in this case, under the settled law governing the right to dispose of one's property, which can sustain the judgment taking from the decedent the right to dispose of his property in the manner and form shown by the oral and record evidence adduced at the trial.

Mrs. McCarthy first met Mr. Kelly in 1925, when he was brought to their home, No. 2207 Fulton Street, San Francisco, by her husband, Jeremiah McCarthy, after they had attended mass. Jeremiah McCarthy and John J. Kelly had been friends for a period of forty years. Mr. Kelly was then living with his sister, his wife being dead. For a short time Mr. Kelly attended church in another neighborhood, but he soon returned to the church at which the McCarthys worshipped, and he often went to the McCarthy home following church services. He left the home occupied by his sister and himself in 1925 because they were not on agreeable terms, and went to San Mateo and from there to Los Angeles. Upon his return from the latter city to San Francisco he went to a hotel Shortly thereafter he visited the home of the McCarthys and, according to the testimony of Mrs. McCarthy, said to Mr. McCarthy that his sister had been insulting to him and he was without a home; that he could not stand her. Jeremiah McCarthy said: ''John, while we have a roof over our heads you will always have a home. Come with Alice and me. Take any room in the house; it is yours. Make yourself comfortable. We will do all we can for you.'' Mr. Kelly asked how much his keep would cost him. He said that he had been paying his sister $60 per month. Jeremiah McCarthy said, ''We don't want anything from you.'' Mr.

Kelly replied that he had never stayed at any place without paying his way and he would not stay unless he was permitted to pay. Mr. McCarthy replied to this, ''Whatever you think, as long as you feel at home.'' He said to Mrs. McCarthy that he wanted her to do his cooking as he was a diabetic and was on a diet and could eat only certain foods. The lady who did the cooking for the McCarthys suggested that he tell them what food he wished and they would cook it for him. The house contained eight bedrooms and he made his selection, paying $60 per month for his board and lodging. Mr. McCarthy suffered a fatal illness which continued for several months, and Mr. Kelly assisted in caring for him through his last sickness to the end. It would seem that at one time Mr. and Mrs. McCarthy were in comfortable circumstances, as they owned several pieces of property of a tenantable character. When the depression came she found her houses vacant. One had been destroyed by fire, and its destruction was a total loss. After her husband's death Mrs. McCarthy rented her Fulton Street property and moved to her Guerrero Street flat. From there she returned to the Fulton Street property and Mr. Kelly continued to occupy a room in the house, as he had done at the Guerrero Street flat. During all the times that Mr. Kelly occupied a room in her houses there also resided with her Mrs. Hannah L. Sweet, a lady past ninety years of age who was blind and paralyzed, and a lady who assisted her in her household affairs. Mrs. McCarthy had known Mrs. Sweet since she, Mrs. McCarthy, was a very young woman. She had lived in the McCarthy household for many years and Mrs. McCarthy was very deeply attached to her and regarded it as her sacred duty to support and care for her so long as she should live. From the Fulton Street residence Mr. Kelly moved to San Mateo, where he owned two houses. He remained there some time and finally went back to San Francisco. When in San Francisco he stopped frequently at Mrs. McCarthy's, but he also divided his time with the Lankershim, Odeon, Grand Central and Argonaut hotels, at his pleasure. He also made a trip to the springs, where he remained for a period. In 1928 he decided to visit his old home in Ireland. He was then living at San Mateo. He came to San Francisco and left his personal effects with Mrs. McCarthy. When he came back from Ireland he first went to the Argonaut Hotel, but he told Mrs.

McCarthy it was too noisy at the hotel and he returned to her house. Before he went to Ireland he had talked with her about her affairs and advised her to make a will, as it would save a great deal of trouble after she was gone; that if she did not the public administrator would profit quite a bit by her failure to make a will. He gave her his photograph, a copy of which was attached to his passport, upon which was written, "May 10, 1925." He remained in Ireland more than three months visiting his brother and old acquaintances. Although he was in the old country for that period of time, neither his brother Charles nor any one of his sisters knew that he had been absent from the state, even for months after he had returned. They occasionally saw him by chance on the street or on a street car, and none of them ever invited him, after June, 1925, to call upon them or had any conversation with him except to pass the time of day in the most formal manner, and did not know that he had been sick in the hospital at any time, nor did they make any effort to locate him. The testimony of each shows that they were absolutely indifferent as to his comfort or welfare or whereabouts.

Mrs. McCarthy testified that Mr. Kelly asked her to marry him and said to her if she would marry him they would live in one of his new houses at San Mateo and he would give her care that she had never before had. She replied to his proposal by telling him that she could not do him the injustice of having him assume the responsibility of the care and support of the old invalid lady she was supporting; that she could not tell how long she would last; that she loved her. He said she was a grand old lady and he had never seen her equal. Mrs. McCarthy told him she would marry him after the old lady went to her rest. She testified that she intended to marry him when the old lady passed, and he said he would wait.

Mr. B. L. Grow, a real estate broker and notary public, a resident of San Mateo, was a close friend and business adviser of Mr. Kelly since 1924. He handled his properties, and Mr. Kelly received his check from the Market Street Railway on the first day of the month at San Mateo. His mail was directed to San Mateo in care of Mr. Grow. He visited San Mateo in the forepart of each month, and frequently two or three times a month. On one or two occasions he had Mrs.

McCarthy visit San Mateo and he introduced her to Mr. Grow. He made Mr. Grow's office his headquarters. He discussed business very often with him. In 1925, after his trouble with Mrs. Hand, he said he was not going to leave anything to his folks; "that they were liars and they were not his kind". He had Mr. Grow write a policy of insurance in the amount of $3,500 on the house which Mrs. Hand and Kelly owned, and inferentially it was the discovery of a representation made to him that the house had been insured when in fact it had not been which provoked the word "liars". Mr. Grow testified that Mr. Kelly spoke very frequently of his deceased wife and Mrs. McCarthy. He said he was very sorry he broke up his home, quit housekeeping and gave his furniture to Mrs. Hand. He thought of leaving his property to charity. He spoke at that time as though Mrs. McCarthy had plenty, but after he returned from his visit to Ireland in 1928 he seemed worried that Mrs. Mc-Carthy, as he said, through no fault of hers had lost the Fulton Street home by fire, recovering no insurance, which was a heavy blow to her, and her property was unrented and he wanted to help her in every way he could. He spoke of her as a capable woman, generous and kind, and she told him she was taking care of an old lady without compensation and he thought it was very noble in her and wanted to help her. He often spoke of her kindness to him and to others. He brought her to San Mateo with the view of exchanging her San Francisco property for San Mateo property. Approximately a year before he died he told the witness that he had converted his bank account into a joint tenancy and asked him if he did not think it was a good thing to do. He was anxious that Mrs. McCarthy should not want and was regretful that she had sustained financial losses. He spoke of his visit to Ireland and the kind treatment accorded him by his brother and his family. He made no mention of his local relatives after his return from Ireland.

James Casey, an employee of the Market Street Railway, had known Mr. Kelly more than twenty years. He met him after his return from the old country, and in the course of their conversation it developed that Mr. Kelly was living at a hotel, and he said to him, "You shouldn't live in a hotel; you should live with your own people." He replied that he could not live with them; could not get along with them. Mr.

John J. Bolger had known decedent for twenty-five years. During a conversation he had with him at the Lankershim about 30 days before he died, Kelly spoke of making a will, and Mr. Bolger told him he had in contemplation the making of his will and the conversation turned on the subject. Kelly said he had left everything to a friend and had given his relatives $5 each; that he had left the key to his safe deposit box with said friend, who could enter the bank and take anything the friend wished; that he had left the bank book with the friend as he had full confidence in his friend, who beyond doubt was Mrs. McCarthy, who had access to his deposit box. Kelly also told him that he had left the Hand home and was living at a hotel. It is plain that the "friend" above referred to was Mrs. McCarthy.

Mrs. Eileen Byrne, who was an inhabitant of the same neighborhood in Ireland as was Mr. Kelly, and was a personal friend of Mrs. McCarthy, testified that a few months before he died he told her that he owned one-half of the house Mrs. Hand lived in and that he formerly lived there with her, but he could not get along with her; that his mail was opened and he had to leave his own relations.

Mrs. Florence Napier, an acquaintance of Mrs. McCarthy for more than twenty years, called on her a short time before Mr. Kelly died. She was out and Mr. Kelly engaged her in conversation while waiting for Mrs. McCarthy's return. He said that he was living at a hotel and in reply to her question as to why he did not live with his relations he said he could not get along with them and they were not his kind. He said that Mrs. McCarthy was a grand woman.

Mrs. Jennie Hand's testimony at least shows that she was indifferent as to the comfort and welfare of her brother, whom she testified was seventy-three years of age. She apparently justified her treatment of him on the ground that she saw him walking in the park on one occasion with Mrs. McCarthy. She said, presumably to the persons whom she was with, "It was too bad to be going around with a married woman; they might wait until her husband passed out." Thereafter, when she returned home she found on the kitchen table the following note, written in his hand: "I am stopping at the Vendome Hotel, Second and North B Streets, San Mateo. You can have everything here. I don't want anything. Wishing you all sorts of good luck. You will be

better off without me. J. J. Kelly.'' The note was written in June, 1925. He came back on August 1st for a check due him from the Market Street Railway Company and directed that his mail be sent to his San Mateo address. That was all the conversation had. After making the remark that she had seen him with Mrs. McCarthy he said to her, ''I don't want anyone to interfere with my affairs.'' She further testified that she saw him on the street several times thereafter and the only words that passed were, ''How are you?'' and the usual salutation in passing the time of day. The last time she saw him was about two months before he died at The Hibernia Loan and Savings Society, and they passed the time of day. She made no inquiry where he was stopping after he left her home; did not know that he had visited Ireland; never talked to him afterwards about Mrs. McCarthy. She never thereafter invited him to her home. She testified that her brother never discussed with her his private affairs or his property. The deed which he had made and delivered to her conveying a one-half interest in said residence property was recorded by her on the day of the funeral. Mrs. Hand was a widow and had no children.

The deposition of Martin Craevan, aged 82 years and a resident of San Mateo, was read into the evidence. The witness was too infirm to appear in court. He had known Mr. Kelly for six or seven years. He visited and conversed with him at San Mateo several times a year. Mr. Kelly also had visited him when he was confined at St. Luke's Hospital at San Francisco. A relatively short time before his death Mr. Kelly said to him, while they were visiting, that he was not going to leave his relatives any money; that he would leave it to charity rather than leave it to them. He said that he and Mrs. Hand owned a house ''between them, a partnership, . . . and he could not get along with her and he told her so. He walked out, put his effects in an automobile, and went to Los Angeles and stayed there for five or six months and didn't go back again.'' Asked whether he mentioned Alice McCarthy by name, he replied: ''I don't think he called her by name, but I think a friend. I cannot remember.'' Fourteen months before Mr. Kelly's death he was confined by illness in the St. Francis Hospital. He had Mrs. McCarthy call up Mr. Eugene L. Byington, an official of the Market Street Railway, and tell him to come to the hospital

at once. Mr. Byington, who was called by the respondent, testified that when he arrived he asked him what the matter was and Mr. Kelly replied, "I am very ill and they think I am going to die." Mrs. McCarthy was present all the time. He arranged for his funeral and the disposition of his remains. He directed the following paper to be drawn, which he signed in his own hand:

"San Francisco, September 1, 1931.

"This is to certify that the undersigned have entered into an agreement whereby Alice S. McCarthy (Friend) and Eugene L. Byington (Friend) will have equal shares in the insurance of John J. Kelly. These shares are to be used to pay the following costs:

"Undertaking services;

"Church services;

"Purchase of a niche in center of mausoleum;

"Mass for repose of soul."

The above was signed by all parties thereto. Upon leaving the hospital he went to Mrs. McCarthy's Ford Street home, where he recuperated and returned to the hotel.

The above transaction clearly indicates his faith in Mrs. McCarthy, and it is also characteristic of decedent's strict business methods in all matters, including the most solemn, and it furnishes strong evidence that his mind was operating freely and unhampered in the performance of the most solemn acts of life. Surely he was not under the influence or domination of Mrs. McCarthy when he arranged that a policy in the sum of $1500 should be devoted to the payment of funeral and burial expenses. Every dollar of the above, and more, was expended in compliance with his wishes.

Charles G. Kelly, a bachelor brother, testified that Mrs. Hand had told him that she spoke to her brother about going out with Mrs. McCarthy and he went "woof"; got mad and left. He said he saw Kelly occasionally at McDonnell's stock brokerage office. He talked to him when he met him in a street car or on the street, but he would not tell him where he stayed, except that he said he stopped at a hotel. He never had a meal with him after 1925.

Mrs. Walton, another sister of Kelly, went east to reside in 1928. She returned in 1932 and met him once on the street and he told her he had made a trip to Ireland. She never saw him again and did not know where he was. Her

brother Charles told her that decedent and Mrs. Hand had had words. One or two witnesses called by the respondent testified that they had visited the Hand home while Mr. Kelly was stopping there and he and Mrs. Hand appeared friendly and he seemed to be well satisfied with his home life. Notwithstanding the testimony of the relations that they never saw any indications that Kelly felt unfriendly toward his relations, nevertheless each one knew of the final breach between him and Mrs. Hand, and their utter indifference as to his welfare is indubitable proof that a wound was inflicted in 1925 by one side or the other which never healed. This being so, it matters not whether the decedent's judgment in the premises was right or wrong, or whether his reasons for doing as he did with his property were good or bad; his right to dispose of his property as he willed did not depend on the merits of any controversy which may have existed between them. (*Estate of Shay, supra; Estate of Smith, supra.*) The rules applicable to the exercise of undue influence in matters testamentary are also applicable to the creation of joint tenancies where the question of undue influence is involved.

Aside from the bank officials and the bank records themselves, Mrs. McCarthy gave the only testimony in the case as to the transfer of the bank accounts. She testified that Mr. Kelly requested her to meet him at Fourth and Market Streets in San Francisco at 2 P. M. on February 19, 1931, as he had some business to attend to. She met him at the appointed time and place. She asked him what he wanted her to do. He said he wished her to do him a favor and she said she would do anything for him. He then said, ''I wish you to allow me to put your name on my bank book.'' The deposition of the witness had been taken some time before the trial and she was examined in great detail from the deposition as to the order in which certain things were done and said at the time the transfers were made at the bank. In her deposition she stated that her reply to Mr. Kelly's request that she allow him to place her name on the bank book was, ''Oh, certainly; I have my business fixed, Mr. Kelly, so if anything happens to me what I have is yours and you take care of the old lady.'' Her recollection at the trial was that this was after the bank transaction; she was not sure as to the time but she was willing to abide by the deposition. She

testified from the first, however, that she made her will in his favor in 1928 with the understanding that if anything should happen to her he was to take care of the old lady, and he said he hoped that nothing would happen to her because no one could take care of her as she did. Conceding that she told him, even before he made the transfer of said deposits, that she had her business fixed up and if anything happened to her everything she had was his, it was but the repetition of what she admittedly told him in 1928, and there would be no point in her deliberately falsifying that fact.

Respondent assails Mrs. McCarthy as being evasive, equivocating and mendacious in her testimony and says that she was not honest or truthful as shown throughout her testimony. We have carefully examined her testimony and there is nothing in it, in our opinion, to sustain such charges. Respondent relies entirely upon the testimony of Mrs. McCarthy to sustain his judgment. Mrs. McCarthy was a widow 48 years of age who had been a housewife during the years of her majority. Her character stands unimpeached. There is no evidence in the record upon which a charge of immorality or venality could be sustained. The testimony of Mrs. Hand that on one occasion she saw Mrs. McCarthy walking with Mr. Kelly in the park, standing alone, is not sufficient to raise a suspicion of meretricious relations on her part. Mrs. McCarthy testified that the only time she was ever in the company of Mr. Kelly unattended by others during her husband's lifetime was at the latter's request, upon which occasion he asked Mr. Kelly to accompany her to the office of the public administrator or coroner to report the death in their home of a young man who had been a roomer there. They rode on a street car on that occasion. No testimony was offered at the trial which tended to impeach her in any way, unless the testimony of Mrs. Hand, by implication, had such a tendency.

Every witness that had occasion to speak of the character of Mrs. McCarthy, with the exception above noted, referred to her as a deserving and worthy woman. She was not a highly educated person, but she appears to have been well grounded in her duty in the common affairs of life. Respondent finds fault with her testimony with respect to some contradictions as to when certain events occurred. She was examined by respondent under the provisions of section 2055 of the Code of

Civil Procedure. Her examination was conducted in an exceptionally able and skillful manner and chiefly with reference to a deposition which respondent had taken some time prior to the trial. Many of the questions were a test of memory rather than a real test of veracity, and naturally there was some uncertainty exhibited and some discrepancies were shown in her evidence by way of comparison. There is no indication that the witness wilfully gave false testimony, or that the inaccuracies in her testimony were sufficient to defeat her right to a judgment. Her testimony as to the making of a will in Kelly's favor, which she claims she informed him of and which she placed in an envelope with her tax bills and other papers kept in Kelly's deposit box for a time, but which later came into her possession with said other papers and which was destroyed by her after Mr. Kelly's death, is not important for the reason that she admitted that she had told him in 1928 about the will. Whether it ever existed, or whether it was destroyed, as related by her, becomes unimportant so far as it may have influenced him to make the transfer in controversy. Respondent also assails her testimony with respect to two deeds which she claims she executed and delivered to Mr. Kelly, but which were not found among his effects. That she actually executed said deeds was proved beyond controversy by Mr. Grow, who furnished the notarial record of said transactions, and by Mrs. Roma Thomas, formerly an employee of the San Francisco Bank, who typed the deeds for Mrs. McCarthy. The deeds were, in all probability, destroyed by him, as the evidence is that he told Mrs. McCarthy he did not want anything from her. That he did not want any of her property is made clear by the course of his relations with her. His concern was not in acquiring more property but in disposing of that which he had. This is shown by his act at the hospital in making preparation for death, and also by the joint tenancy transaction, and lastly by a will which he executed in 1930 in which his brother in Ireland and Mrs. McCarthy were made his beneficiaries. After his hospital experience in September, 1931, he knew that the end was not far distant. There could be no question in his mind as to which one would survive the other.

Respondent stresses two other features of Mrs. McCarthy's testimony. The first consisted in the fact that the witness, at the trial, enlarged on her testimony contained in the dep-

osition. Her answer to the question as to why she did not give the testimony at the taking of the deposition that she was then giving, was as follows: ''A. No, I didn't tell in the deposition, I never was used to—I was not coached what to do, I did to the best of my knowledge, with no sleep in three months with a neurotic patient.'' The context which follows shows very clearly that the witness did not mean that she had been instructed by her attorney as to the answers she should give to any questions asked her, but that the subject matter of the question had not been considered by her or her attorney and she was taken by surprise. There is no merit in the claim that she had been coached as to what answers she should give to questions asked without regard to the truth or falsity of her answers. Counsel cites as a reason why the witness should be discredited, the following: ''Q. Have you talked with Mr. Grow about these deeds since this case came up as to whether or not he had acknowledged these deeds?'' The question obviously contains two propositions. The witness in open court turned to her attorney and said: ''Mr. Bucher, what shall I say?'' This incident, so far as affording grounds of impeachment is involved, is, we think, too trivial to require discussion.

█ Respondent claims that a confidential relation existed between the parties by reason of the contingent understanding of the parties that they were to intermarry; that Mrs. McCarthy is deemed a trustee. (Sec. 2235, Civ. Code.) He did not plead the existence of promise of marriage as the basis of undue influence, nor did the court make a finding that such relationship existed. Granting, however, without deciding, that under the relationship which existed between Mr. Kelly and Mrs. McCarthy a confidential relation was established, the proof is so conclusive that the conversions of said bank deposits into joint accounts were not obtained by fraud or undue influence as to rebut any presumption of undue influence. The evidence, both record and oral, abundantly shows that said acts were freely and voluntarily done and there was no weakness of mind on the part of Mr. Kelly at any time prior to his fatal illness. While it is not necessary that a reason for his acts should appear, provided he was free of legal disability, nevertheless substantial reasons support said acts.

■ Undue influence in procuring execution of a deed means influence amounting to moral coercion destroying grantor's free agency and constraining him to do what is against his will but what he is unable to refuse. (*Walters* v. *Walters,* 151 Ga. 527 [107 S. E. 492].)

The influence which will avoid a deed cannot proceed alone from sympathy or affection for the grantee but must be such as to dominate the grantor's will and coerce it to serve the will of another in the act of conveying, and a grantee who by his kindness and attention, won the affection of a relative, who executed a deed to him as he anticipated, did not thereby obtain the deed by undue influence. (*Stroup* v. *Austin,* 180 Ala. 240 [60 So. 879].)

Undue influence comprehends overpersuasion, coercion or force that destroys or hampers free agency and will power of the testator, and mere affection or attachment or a desire to gratify the wishes of one beloved, respected and trusted may not of itself amount to undue influence affecting testamentary capacity. (*Newman* v. *Smith,* 77 Fla. 667 [82 So. 236].)

"Influence gained by kindness and affection will not be regarded as 'undue' if no imposition or fraud be practiced, even though it induce the testator to make . . . an unjust disposition of his property in favor of those who have contributed to his comfort and ministered to his wants, if such disposition is voluntarily made. *Matter of Gleespin's Will,* 26 N. J. Eq. 523." (*Mackall* v. *Mackall,* 135 U. S. 167 [10 Sup. Ct. 705, 34 L. Ed. 84].)

Many other cases of the same import may be added to those above cited. The facts of the instant case cannot withstand the test which the law prescribes. The evidence is without contradiction to the effect that decedent was a free agent, going from place to place at will, free to adopt his own course, and was not under the restraint of any person. He was a man positive of character, self-willed, mentally sound and independent in thought and action.

That his acts were the result of mature deliberation is further attested by the fact that he made a will in 1930 in which he devised his real property, of the value of about $7,000, to Mrs. McCarthy and his brother residing in Ireland. This will was treated as admitted in evidence at the trial, but as a matter of fact it was not included in the record on appeal.

Decedent being under no legal obligation to provide for respondent by will or otherwise, and said respondent having failed to show any valid reason why the transaction of February 19, 1931, with respect to said bank accounts and deposits should be held to be invalid, he must fail in his action.

The judgment is reversed.

Langdon, J., Curtis, J., Conrey, J., Shenk, J., and Waste, C. J., concurred.

Rehearing denied.