107 Cal.App.2d 831 (1951)
238 P.2d 150
Estate of CHARLES E. KREHER, Deceased.
CALIFORNIA TRUST COMPANY (a Corporation), as Executor, etc., Respondent,
v.
POLLY CULBERTSON et al., Appellants. BEN H. BROWN, as Public Administrator, etc., Appellant,
v.
CALIFORNIA TRUST COMPANY (a Corporation) as Executor, etc., Respondent.
Docket Nos. 18554, 18555.
Court of Appeals of California, Second District, Division Three.
December 4, 1951.
*834 Guthrie, Darling & Shattuck, Newlin, Holley, Tackabury & Johnston for Appellants.
Harold W. Kennedy, County Counsel, R. Eldon Dick, Deputy County Counsel, Lindstrom & Bartlett, William C. Bartlett and Harris Robison for Respondent.
VALLEE, J.
These actions, one to set aside joint tenancy agreements, to recover personal property and a penalty under Probate Code section 612, the other a will contest after probate  were consolidated for trial and are consolidated on appeal.
There are two appeals. In the action to set aside the joint tenancy agreements, the public administrator, as administrator of the estate of Charles E. Kreher, deceased, appeals from a judgment decreeing that the joint tenancy agreements were not procured by "coercion, fraud or undue influence." In the will contest, the contestants, Polly Culbertson, Osgood Sayne, and Estella Sayne, beneficiaries under a prior will, appeal from an order granting a new trial after judgment entered in their favor upon special verdicts of a jury.
Charles E. Kreher (called Charles) and John Jacob Kreher (called Jacob) were brothers. Charles died November 13, 1945, aged 70, a widower, without issue. Jacob was Charles' only heir. Jacob died September 8, 1948, aged 75, unmarried. The fortunes accumulated by the two brothers stem primarily from proceeds derived from the sale of their parents' bakery and confectionary business, from property which was left upon their mother's death, from their personal investments, and in the case of Charles, from half of the proceeds of his wife's estate. Following the sale of the bakery and confectionary business in 1918, the brothers retired and neither was thereafter gainfully employed.
In 1926 the brothers moved to California with their mother who died in 1933. Charles moved to Pennsylvania in 1934 or 1935 and there met Mrs. Polly Culbertson, one of the contestants, and her husband. In 1936 or 1937, he married Edna Giles who was a close friend of Polly Culbertson. On July 2, 1936, while a resident of Pennsylvania and presumably while on one of his several visits to California, Charles opened safe deposit box No. 2945 in joint tenancy with Jacob. On that date he also opened a commercial bank account jointly with Jacob. On July 27, 1942, Charles' wife died. On the day of her death, Charles executed the will under which contestants claim as beneficiaries.
*835 On July 31, 1942, a few days after his wife's death, Charles suffered a stroke, described by one doctor as "of moderate intensity," and was cared for temporarily by Polly Culbertson. On August 3, 1942, Jacob was notified of his brother's illness by the latter's chauffeur, Cadwell. On August 5th Jacob closed the joint commercial bank account and safe deposit box No. 2945. In place thereof he opened in his own name a substitute safe deposit box to which the jointly owned property was transferred, and also a commercial bank account. Thereafter, Jacob, together with Maud Leaf, his housekeeper, left for Pennsylvania. On August 6th Charles was taken to a hospital. On August 8th Jacob arrived in Pennsylvania and was immediately taken to the hospital. Charles told his brother he had been poisoned and wanted to see a lawyer immediately. Eli F. Wismer was procured. Wismer testified that: Cadwell, Charles' chauffeur, made the appointment; he met Charles, as well as Jacob, for the first time that day; he had a private interview with Charles who was in bed and who told him, "I want to make a will, and I want to give everything to my brother"; he did not discuss any matter pertaining to the will with Jacob; the will, which named Jacob as sole beneficiary, was signed by mark and witnessed by Cadwell and himself. Jacob then had Charles transferred to another hospital where he stayed for one week and then went home.
On July 30, 1942, shortly after the death of his wife, Charles employed Isabel Darlington, an attorney, to probate a will left by his wife in Pennsylvania. Miss Darlington testified that Charles told her he was leaving for California and did not want anyone, other than Cadwell, to know where he was, particularly contestant Polly Culbertson, who, he said, "had, after the death of his wife, undertaken to run the household there.... He had had almost a fatal illness which he thought had been brought about by her treatment of him ... and he said, `I owe my life to the fact that my brother came on and got me out of her clutches.'"
Sometime in September, 1942, the two brothers, with Mrs. Leaf, returned to California where the brothers resided together in the Hillview Apartments until the death of Charles.
On October 14, 1942, Jacob transferred to Charles the contents of the safe deposit box and commercial account, formerly held by them jointly, which Jacob had transferred into his own name on August 8, 1942, prior to leaving for Pennsylvania. The bank account and safe deposit box were then reopened by Charles in his name alone.
*836 On August 30, 1943, Charles received $27,808.22 from the estate of his wife, deposited it to his individual account, and, on the same day, executed the holographic will in contest leaving all his estate to Jacob.
On October 11, 1943, Charles converted the bank account and safe deposit box held by him in his own name into joint ones with Jacob, and Jacob likewise converted his individual bank account and safe deposit box into joint tenancy with Charles.
On November 13, 1945, Charles died suddenly.
On November 14, 1945, Jacob, as surviving joint tenant, without notifying the bank of Charles' death, closed the joint tenancy account and safe deposit box.
Two years after the death of his brother, Jacob was cited into court in a proceeding to discover Charles' assets. While this was pending and on March 28, 1947, Jacob filed Charles' holographic will of August 30, 1943, for probate. It was admitted to probate and letters testamentary issued to Jacob.
On October 17, 1947, Polly Culbertson, Osgood Sayne, and Estella Sayne, beneficiaries under the will executed by Charles on July 27, 1942, filed a contest to revoke probate of the will of August 30, 1943. On the morning the will contest came on for trial, September 8, 1948, Jacob committed suicide. California Trust Company was appointed executor of his will.
On February 2, 1949, the public administrator was appointed administrator with the will annexed of Charles' estate. Thereafter he brought suit against the trust company as executor of Jacob's will, and others, to recover certain bank accounts and securities formerly belonging to Charles. The action was subsequently dismissed as to the other defendants. The first count of the complaint alleged that the joint tenancy agreements, with respect to the bank account and safe deposit box, were procured through Jacob's undue influence. The second count alleged that during Charles' lifetime Jacob converted to his own use certain of Charles' properties of a value exceeding $200,000. The third count sought recovery under Probate Code section 612 of double the value of the properties allegedly "concealed, embezzled, and fraudulently disposed of" by Jacob.
The two actions were consolidated for trial before a jury. In the joint tenancy case, the jury found, upon special interrogation, that Charles had been "induced to sign the joint tenancy agreements of October 11, 1943, for bank and safe deposit box by means of undue influence" exercised by Jacob. The court held that the verdict was advisory only, made findings that the agreements had not been procured by undue *837 influence, and rendered judgment for respondents. In the will contest, the jury found for the contestants. Judgment was entered accordingly. Thereafter, upon motion of the trust company, the court granted a new trial.
Appellants ask us to "analyze all of the evidence in light of reason and human experience and give consideration to the motive and propensities which tend to influence human action, and the appellants are satisfied that after so doing this court can only conclude that the verdicts of the jury were right."
[1] We are impelled to repeat what we said in Overton v. Vita-Food Corp., 94 Cal. App.2d 367, 370 [210 P.2d 757]: "Andre Gide once observed: `Everything has been said already; but as no one listens, we must always begin again.' With rhythmic regularity it is necessary for us to say that where the findings are attacked for insufficiency of the evidence, our power begins and ends with a determination as to whether there is any substantial evidence to support them; that we have no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom. No one seems to listen."

The Joint Tenancy Action
The public administrator, as administrator of Charles' estate, contends that (1) it was an abuse of discretion for the trial court to ignore the advisory verdict of the jury finding that the joint tenancy agreements were procured through Jacob's undue influence, and (2) that the findings, conclusions of law, and judgment are not supported by the evidence.
[2] While it is a matter of statutory right (Prob. Code, §§ 371, 382) to have the issue of undue influence in a will contest determined by a jury, there is no right to a trial by jury where the gist of the action is one for the enforcement of a right cognizable only in equity. (Ford v. Palisades Corp., 101 Cal. App.2d 491, 499 [225 P.2d 545], and cases there cited.) At the trial it was conceded by counsel that the issues presented in the joint tenancy action were equitable. [3] Where a jury trial is not a matter of right, but is nonetheless permitted, the verdict rendered is advisory only. The court may accept or reject it, and, irrespective of the verdict, must make findings to complete the record. (Sweetser v. Dobbins, 65 Cal. 529, 530-1 [4 P. 540]; Schooler v. Williamson, *838 192 Cal. 472, 478 [221 P. 195]; Simon Newman Co. v. Woods, 85 Cal. App. 360, 363 [259 P. 460].) [4] Since the gist of the joint tenancy action was concededly equitable, the court's action in rejecting the verdict was entirely within its discretion. [5] Where the court has rejected the advisory verdict and its findings are supported by substantial evidence, the judgment may not be disturbed on appeal. The basic question, therefore, is the sufficiency of the evidence to support the findings.
The court found that: at "various" times and "from time to time" Charles and Jacob had held individually owned property in joint tenancy; on October 11, 1943, the brothers converted their individual bank accounts and safe deposit boxes into joint tenancy and Charles was not influenced to do so by Jacob's undue influence; on Charles' death practically all of the property of the two brothers, previously individually owned, was held in joint tenancy; and no property or money came into the possession of the defendant trust company, as executor of Jacob's will, by reason of any unlawful act of Jacob.
The court concluded that no undue influence had been practiced by Jacob upon or over Charles, and that both joint tenancy agreements were created as the free and voluntary acts of Charles; that Jacob did not convert to his own use any of Charles' property during the latter's lifetime; and that plaintiff was not entitled to recover from the executor trust company.
Appellant public administrator relies on the rule that where a confidential relation exists between the parties, and the one in whom confidence is reposed actively participates in a transaction whereby he obtains a gift or advantage over the other, a presumption of undue influence arises and the burden of rebutting it and showing fairness and good faith is cast upon the one who has gained the advantage. He also says that irrespective of the presumption, the evidence without conflict established undue influence.
There was evidence from which the court reasonably could have concluded that a confidential relation existed between the brothers. [6] However, mere proof of a confidential relation is not of itself sufficient to establish undue influence or to cast the burden of negativing undue influence upon the party alleged to have exercised it. Proof of such relation must be coupled with proof that the one in whom confidence was reposed actively participated in the transaction and that by the transaction he obtained a gift from or *839 advantage over the other. (Fish v. Security-First Nat. Bank, 31 Cal.2d 378, 384 [189 P.2d 10].) [7] There was no evidence as to the contents of the safe deposit boxes which were converted into joint tenancy on October 11, 1943. There was no evidence that Jacob obtained a gift from or advantage over Charles by the execution of the joint tenancy agreements. All that the evidence showed was that the agreements were signed by the brothers on October 11, 1943. It does not appear that they were present at the same time. No one who was present at the signing of either the bank account or joint tenancy agreement was produced as a witness. Assuming that Jacob was present at the time Charles signed the agreements, that fact of itself is not necessarily indicative that Jacob participated or was active in procuring the agreements.
[8] The rules applicable to proof of undue influence in a will contest apply to the creation of joint tenancies where the question of undue influence is involved. (Kelly v. McCarthy, 6 Cal.2d 347, 360 [57 P.2d 118]; Fish v. Security-First Nat. Bank, 31 Cal.2d 378 [189 P.2d 10].)
[9] In order to set aside a joint tenancy agreement on the ground of undue influence, it is necessary to establish that the influence was such as to destroy the free agency of the party claimed to have been unduly influenced. It is not sufficient to prove general influence, however strong and controlling, but it must be shown that the influence was used directly to procure the joint tenancy. It must amount to coercion destroying the free agency of the party claimed to have been unduly influenced. Opportunity to influence the mind of such party, even coupled with an interest, is not sufficient. (Fish v. Security-First Nat. Bank, supra, 31 Cal.2d 378, 385; Kelly v. McCarthy, supra, 6 Cal.2d 347, 364; Estate of Arnold, 16 Cal.2d 573, 577 [107 P.2d 25]; Estate of Clarke, 62 Cal. App.2d 228, 231 [144 P.2d 425].)
We need not nor would it serve any useful purpose to meticulously review in detail the some 1451 pages of oral testimony and the mass of documentary evidence which were before the trial court. [10] The rule is that we must view the evidence in the light most favorable to the prevailing party; consequently we do not recite the evidence favorable to appellant. [11] Suffice it to say that while the evidence was highly conflicting in many respects, there is abundant support in the record of a substantial character from which the court could conclude that the joint tenancy agreements of October *840 11, 1943, were freely and voluntarily made by Charles at a time when he was mentally alert, physically sound, and fully aware of the import of, and consequences attending, their creation.
While the evidence shows that upon his return to California in September, 1942, Charles had not fully recovered from his illness, it does show that in the early part of 1943 and thereafter until his death he was in "pretty good" health and, as one witness put it, "as well as he ever was," both physically and mentally. It appears that Charles was above average in intelligence, widely traveled, well read, an interesting conversationalist, and active in the stock market and its manipulations. There was evidence that he went from place to place at will, saw and talked to his old friends and others, received his own mail, and was not confined or restrained by Jacob. Although he took daily walks with Jacob, he frequently went out alone, or in the company of others, was in frequent attendance at a stock brokerage house, checked over and studied the market, purchased securities from the bond department of the bank while alone, and almost daily, outside the presence of Jacob, visited with the other tenants in the lobby of the apartment house.
There was no evidence that whatever influence, if any, Jacob, as the elder brother, may have had over Charles was used to procure the joint tenancy agreements. The evidence showed that the brothers since 1936 had pursued some sort of a policy or plan by which, at various times, individual bank accounts and safe deposit boxes had been converted by them into joint accounts with each other. The court was fully justified in inferring therefrom that in converting his individual bank account and safe deposit box into joint tenancies on October 11th Charles was voluntarily and freely pursuing the same policy he had in the past and that he was not unduly influenced by Jacob to do so. Upon the death of Charles, Jacob became the sole owner of the property.
In view of the foregoing, it is unnecessary to determine whether the court erred in granting defendant's motion for nonsuit as to the third cause of action which sought, under Probate Code, section 612,[*] double the value of the property allegedly appropriated by Jacob.

*841 The Will Contest

The will contest was based upon three grounds, (1) the holographic will was not entirely written, dated and signed by Charles, (2) unsoundness of mind, and (3) undue influence exerted by Jacob. A motion for nonsuit was granted as to count two and denied as to counts one and three. Respondent's motion for a directed verdict on the remaining counts of the contest was denied. The jury, upon special interrogatories, found (1) that the will was not entirely in the handwriting of Charles, and (2) was procured by undue influence.
A motion for judgment notwithstanding the verdict was denied and judgment entered setting aside the probate of the will. Respondent's motion for a new trial was granted on the ground that the evidence was insufficient to justify the special verdicts.
[12] "The rules which govern a reviewing court in the determination of an appeal from an order granting a new trial are so well known they need not be repeated. The Supreme Court has recently said that the order of the trial court will be reversed only when it can be said as a matter of law that there is no substantial evidence to support a contrary judgment. (Brooks v. Metropolitan Life Ins. Co., 27 Cal.2d 305, 307 [163 P.2d 689].)" (Brattain v. Pacific Elec. Ry. Co., 98 Cal. App.2d 678, 680 [220 P.2d 747].)
[13] Appellants claim that the figures "1943," a part of the date in the holographic will, were not written by Charles but were written by Jacob. They concede that the remainder of the will was written by Charles and that he signed it. They contend that this court should conclude, as a matter of law, that the figures "1943" were not written by Charles and on that ground reverse the order granting the new trial. Two qualified handwriting experts testified that in their opinions the figures "1943" were written by Charles. There was no contrary expert testimony. This evidence was sufficient to warrant the trial court in concluding that the evidence was insufficient to support the finding of the jury that the will was not entirely written, dated, and signed by Charles.
[14] We cannot say, as a matter of law, that there was no substantial evidence to support a verdict for respondents on the issue of undue influence as to the will. What we have said with respect to the evidence in the action to set aside the joint tenancy agreements and the law applicable thereto applies to the appeal in the will contest. At most, all that *842 appellants' proof showed was that a confidential relation existed between the brothers and that Jacob had an opportunity to guide Charles in his testamentary act. These facts, however, are insufficient to support a finding of undue influence in the absence of proof that whatever influence Jacob had over Charles was such as to, and that it did, destroy his free agency. There was no proof whatever that Charles was urged or importuned by Jacob or anyone to make the will (or enter into the joint tenancy agreements), or that it was ever suggested by anyone that he ought to give his property to Jacob. To hold otherwise would be to "enter upon the field of conjecture." (Estate of Muller, 14 Cal. App.2d 129, 130 [57 P.2d 994].)
[15] There was ample evidence to warrant the court's conclusion that the evidence was insufficient to justify the verdict of the jury as to undue influence. Blanche L. Deibler, cashier of the Bond Department of the California Bank, testified that about the time the holographic will was dated Charles came to the bank, talked with her concerning the making of an holographic will, and stated "he wanted to have the very best and safest kind of will he could have to protect his brother"; he asked her if she had a form of holographic will; she obtained a form for him, he read it, and asked her to type a copy of it, which she did, but did not "know if he ever used" what she had typed; a "couple of weeks" later Charles came back to the bank, pulled an envelope out of his pocket and said, "This is my will and I am going to put it down in my safety deposit box."
Maud Leaf testified to a conversation she had with Charles about the time the will was made in which he told her he was going "down and make another will tomorrow morning."
We think it obvious that it cannot be said that the court abused its discretion in granting the new trial. (Brooks v. Metropolitan Life Ins. Co., 27 Cal.2d 305, 307 [163 P.2d 689].)
Respondents urge that their motions for a directed verdict and for judgment notwithstanding the verdict should have been granted. An order denying a motion for judgment notwithstanding the verdict may be reviewed on appeal when a new trial is granted to the party moving for such judgment and the adverse party appeals from the order granting a new trial. (Code Civ. Proc., § 629; Estate of Green, 25 Cal.2d 535, 545 [154 P.2d 692].) A motion for judgment notwithstanding the verdict may be granted only when it can be said, as a matter of law, that there is no evidence of sufficient substantiality *843 to support a verdict in favor of the contestants. While the trial judge might be justified in granting a new trial, he might not be justified in granting a motion for judgment notwithstanding the verdict on the same evidence. (Estate of Green, 25 Cal.2d 535, 546 [154 P.2d 692]; Hunt v. United Bank & Trust Co., 210 Cal. 108, 117-118 [291 P. 184]; Estate of Caspar, 172 Cal. 147, 150 [155 P. 631].) We cannot say, as a matter of law, that there was no evidence of sufficient substantiality to support a verdict for contestants.
The order granting a new trial in the will contest (Civil No. 18554) and the judgment in the action to set aside the joint tenancy agreements (Civil No. 18555) are, and each is, affirmed.
Shinn, P.J., and Wood (Parker), J., concurred.
*844 
NOTES
[*] "If any person embezzles, conceals, smuggles or fraudulently disposes of any property of a decedent, he is chargeable therewith, and liable to an action by the executor or administrator of the estate for double the value of the property, to be recovered for the benefit of the estate." Prob. Code, § 612.