[L. A. No. 8244.  In Bank.—July 1, 1925.]

In the Matter of the Estate of HENRY J. SHAY, Deceased. GEORGE W. SHAY et al., Appellants, v. WILLIAM SHAY et al., Respondents.

[1] WILLS — MENTAL DERANGEMENT OR INSANITY — EVIDENCE.—Mere proof of mental derangement or even of insanity in a medical sense is not sufficient to invalidate a will, but the contestant is required to go further and prove either such a complete mental degeneration as denotes utter incapacity to know and understand those things which the law prescribes as essential to the making of a valid will, or the existence of a specific insane delusion which affected the making of the will in question.

[2] ID.—CONTEST TO REVOKE PROBATE—TESTAMENTARY CAPACITY OF TESTATOR—EVIDENCE—PRESUMPTIONS.—In this contest to revoke the probate of a will, upon the question of general testamentary capacity of the testator, there is no evidence which conflicts with the conclusion that the testator at the time of the making of the will understood the nature of the business in which he was engaged; that he had a recollection of the property he meant to dispose of and of the persons to whom he desired to bequeath it and of the manner in which he desired to distribute it; and this being so, the evidence is insufficient to overcome the presumption of sanity in these respects.

[3] ID.—ILLITERACY OF TESTATOR—BEARING UPON SANITY OR TESTAMENTARY CAPACITY.—The circumstance that the testator was uneducated and illiterate, unable to read handwriting and unable to write except to sign his name, has no bearing upon his mental sanity or testamentary capacity.

[4] ID.—MISTAKEN BELIEF OF TESTATOR—EVIDENCE.—The fact that the testator when dictating the terms of the will expressed a belief that one of his daughters was addicted to the use of liquor and drugs and stated in effect that a trust provision for her benefit was because of his fear that she would squander the money, when in fact this daughter was neither a drunkard, a drug addict, nor a spendthrift, does not make the will the product of a delusion which affects the testamentary purpose of the testator, where this belief of the testator, mistaken though it may have been, is not shown to be without reason or evidence or that it was adhered to against reason or against evidence.

1. What constitutes capacity or incapacity to make a will, notes, 27 L. R. A. (N. S.) 2; L. R. A. 1915A, 444. See, also, 28 R. C. L. 86.

4. See 28 R. C. L. 90.

[5] ID.—INSANE DELUSIONS.—The existence of a mere delusion, that is to say, a false or mistaken belief concerning the existence of a fact, does not affect testamentary capacity. A delusion to invalidate a will must be an insane delusion, that is to say, a belief which is the spontaneous product of a diseased mind, which comes into existence without reason or evidence to support it and which is adhered to against reason and against the evidence.

[6] ID.—FINDING OF TESTAMENTARY INCAPACITY—EVIDENCE.—In such contest, the finding of testamentary incapacity is not sustained by the evidence.

[7] ID.—UNDUE INFLUENCE—EVIDENCE.—In such contest, the evidence falls short of showing such undue influence as in effect destroyed the testator's free agency and overpowered his volition at the time of the making of the will.

[8] ID.—ACTIVITY OF DAUGHTER OF TESTATOR—UNDUE INFLUENCE.—In such contest, conceding that a daughter of the deceased who cared for him throughout the last years of his life sustained a confidential relation toward deceased, and further conceding that she unduly profited by the will, the burden was not upon her to show that the will was not induced by coercion or fraud, where there was no evidence that she was active in procuring the execution of the will, or that she participated therein to any extent, nor any evidence that she even knew of the execution of the will until some time thereafter.

[9] ID.—PROCURING EXECUTION OF WILL—EVIDENCE.—In such contest, the circumstance of the expressed intention of the daughter to send for a brother (who was in the east) to have a will made and the fact that she did send for him do no more than give ground for a suspicion that she may have participated in procuring the will to be executed, but a finding to that effect based upon such evidence would be the product of speculation and conjecture.

[10] ID.—ACTIVITY OF SON OF TESTATOR IN PROCURING EXECUTION OF WILL—EVIDENCE.—In such contest, where the son of the testator, who came to see his father in response to his sister's request, mentioned the subject of a will to his father about three weeks after his arrival, and thereupon the father requested the son to get a pencil and paper and take notes of the manner in which he desired to leave his property and then take those notes to an intimate friend of the father and request such friend to have a will pre-

5. Testamentary capacity and insane delusions, note, 8 Am. Rep. 184.

Insane delusion with respect to relatives as affecting testamentary capacity, notes, Ann. Cas. 1916C, 4, 29, 33, 35; Ann. Cas. 1918D, 471. See, also, 28 R. C. L. 102 et seq.

10. Preparation of will by beneficiary as evidence of undue influence, note, 15 Ann. Cas. 551.

pared in accordance therewith, and this was done, and thereafter the son called at the friend's office and procured a copy of the proposed will, which he read to his father paragraph by paragraph, and the latter expressed himself as satisfied therewith, and it was then arranged that the friend would call at the testator's house with witnesses for the execution of the will, but, before this had been done, the son left for his home in the east, the things done by the son do not constitute such activity in procuring the execution of the will as to bring into operation the rule that where one who unduly profits by the will sustains a confidential relationship to the testator and actually participates in procuring the execution of the will, the burden is upon him to show that the will was not induced by coercion or fraud.

[11] ID.—PROFIT TO BE DERIVED BY SON—EVIDENCE.—In such contest, it cannot be said that such son will unduly profit from the will of the testator.

[12] ID.—UNNATURAL WILL—EVIDENCE.—In such contest, the will under attack cannot be said to be an unnatural will, where the testator made provision for all of the natural objects of his bounty; and the fact that he did not provide for them equally is but to say that he exercised his legal right of testamentary disposition instead of leaving his estate to be distributed according to the law of succession.

[13] ID. — UNJUST WILL — MATTER OF OPINION. — In such contest, whether or not the will is unjust is a matter of opinion, as to which the court has no right to substitute the opinions of the jurors or of the members of the court for that of the testator.

[14] ID.—REASONS FOR DISCRIMINATION—PROVINCE OF JURY AND COURT. In such contest, where the evidence discloses that there were reasons present in the mind of the testator for the discrimination against the contestants, whether those reasons were good or bad was not for the jurors to say and is not for the appellate court to determine.

[15] ID. — BELIEF OF TESTATOR — FAILURE OF SON TO CONTRADICT — KNOWLEDGE—FRAUD.—In such contest, the fact that a son of the testator did not contradict the belief, expressed by the testator when he was dictating to the son the provisions to be included in his proposed will, that one of his (the testator's) daughters was addicted to the use of liquor or drugs, is not sufficient to hold the son guilty of fraud, where it does not appear that the latter had any knowledge whatsoever as to the truth or falsity of this belief of the testator.

---

12.  Effect of unnatural testamentary disposition on question of undue influence, notes, 7 Ann. Cas. 894; 6 L. R. A. (N. S.) 202; 22 L. R. A. (N. S.) 1024.

[16] ID.—TRUST—DISCLOSURE.—Where there exists a relationship of trust and confidence it is the duty of one in whom the confidence is reposed to make full disclosure of all material facts within his knowledge relating to the transaction in question and any concealment of material facts is a fraud.

[17] ID.—REVIEW OF EVIDENCE—APPEAL.—Upon a review of the sufficiency of the evidence it must be construed most strongly in support of the verdict, and, in cases of conflict, the evidence which tends to support the verdict must be accepted as true and that which conflicts with it rejected, and where conflicting inferences may reasonably be deduced from facts proved, those must be adopted which tend to support the verdict.

(1) 40 **Cyc.**, p. 1004, n. 3. (2) 40 **Cyc.**, p. 1018, n. 1, p. 1022, n. 19. (3) 40 **Cyc.**, p. 1013, n. 61. (4) 40 **Cyc.**, p. 1032, n. 3. (5) 40 **Cyc.**, p. 1013, n. 68, p. 1014, n. 69, p. 1015, n. 73, p. 1032, n. 3. (6) 40 **Cyc.**, p. 1023, n. 29. (7) 40 **Cyc.**, p. 1144, n. 53, p. 1164, n. 80, p. 1165, n. 87. (8) 40 **Cyc.**, p. 1153, n. 14 New. (9) 40 **Cyc.**, p. 1164, n. 80. (10) 40 **Cyc.**, p. 1152, n. 10. (11) 40 **Cyc.**, p. 1154, n. 25. (12) 40 **Cyc.**, p. 1079, n. 88. (13) 40 **Cyc.**, p. 1331, n. 41 New. (14) 40 **Cyc.**, p. 1033, n. 12, p. 1331, n. 41 New. (15) 40 **Cyc.**, p. 1143, n. 47 New, p. 1165, n. 87. (16) 40 **Cyc.**, p. 1143, n. 47 New. (17) 4 **C. J.**, p. 773, n. 2.

APPEAL from a judgment of the Superior Court of Los Angeles County. Elliott Craig, Judge. Reversed.

The facts are stated in the opinion of the court.

R. W. Richardson, Cruickshank, Brooke & Evans and J. Russell Morton for Appellants.

Louis F. Labarere and John A. Cronin for Respondents.

MYERS, C. J.—This is an appeal from a judgment revoking the probate of a will upon a contest thereof instituted after probate. The will in question was executed February 27, 1922, about four months prior to the testator's death. The testator's next of kin at the time of the execution of the will and at the time of his death consisted of two daughters and four sons of the testator, all of whom were of mature years and all of whom are parties hereto, either as contestants, or defendants. The estate, which consisted of real and personal property of the aggregate value of twenty-one thousand five hundred dollars, was disposed of

by the will as follows: After making provision for the payment of debts and expenses, five hundred dollars was provided for the erection of a monument upon the family burial lot and one hundred dollars for the saying of masses. Two thousand dollars was bequeathed in trust to pay the income thereof to the testator's daughter Ellen, one of the contestants herein, during the term of her life, and upon her death to distribute the principal among the testator's descendants then living, to take by right of representation. One thousand dollars was bequeathed in trust to pay the income thereof to testator's son William, one of the contestants herein, during his life, and upon his death to distribute the principal among the testator's descendants then living, to take by right of representation. The testator's home place, consisting of a house and lot, together with the household furniture, appraised at four thousand five hundred dollars, was devised to the testator's daughter Margaret, with whom the testator lived for several years immediately preceding and up to the time of his death. The remainder of the estate was bequeathed in equal shares to the daughter Margaret and the sons, Edward, George, and Daniel, defendants and appellants herein. The grounds of contest were unsoundness of mind and undue influence and fraud alleged to have been exercised by the daughter Margaret and the son George. The jury found in favor of contestants upon each of these issues and the judgment revoking the probate of the will followed. Numerous points are presented and argued by appellants but they resolve themselves in the main to the contention that the evidence was insufficient as a matter of law to sustain each of the findings of the jury.

[1] It is well settled that mere proof of mental derangement or even of insanity in a medical sense is not sufficient to invalidate a will, but the contestant is required to go further and prove either such a complete mental degeneration as denotes utter incapacity to know and understand those things which the law prescribes as essential to the making of a valid will, or the existence of a specific insane delusion which affected the making of the will in question (*Estate of Russell*, 189 Cal. 759, 769 [210 Pac. 249]). [2] Upon the question of general testamentary capacity we find no evidence in the record which conflicts with the conclusion that the testator at the time of the making of the will under-

stood the nature of the business in which he was engaged; that he had a recollection of the property he meant to dispose of and of the persons to whom he desired to bequeath it and of the manner in which he desired to distribute it. This being so, it follows that the evidence was insufficient to overcome the presumption of sanity in these respects. The evidence relied upon by respondents in this connection shows that the testator was seventy-seven years of age; that he was suffering from cancer of the bladder, with which he had been afflicted for some time and from which he ultimately died; that at times he suffered intense pain therefrom but that he was able to be up and dressed and about the house nearly every day; that on Saturday, two days prior to the execution of the will, when his son William called to see him, "He was lying on the couch. I went over to look at him and he turned part way around and his eyes seemed glassy and he was awful sick"; that sometime during the January preceding the making of the will a daughter-in-law of the testator called upon him while he was at the hospital following an operation, when he seemed to be in a stupor and did not recognize her; that a neighbor called to see the testator at a time which may have been a week or ten days following the execution of the will when he was in bed sick and did not speak to her and did not give any sign of recognition; that a month or two prior to the execution of the will a neighbor, upon whose property the testator held a mortgage concerning which there was "a little trouble," called upon testator to discuss the matter and testified in effect that testator did not seem to be able to readily understand what the witness wanted; that a daughter-in-law of the testator upon an occasion in January preceding the execution of the will, in a conversation with testator had to repeat things to him two or three times before he understood what she meant. [3] The circumstance that the testator was uneducated and illiterate, unable to read handwriting and unable to write except to sign his name manifestly has no bearing upon his mental sanity or testamentary capacity. All the witnesses who testified directly as to testator's mental condition stated unequivocally that in their opinion he was sane and of sound mind. But, disregarding this, and giving consideration only to the testimony most favorable to contestants upon this issue, it is utterly insufficient to sustain

a finding of general testamentary incapacity. (*Estate of Holloway*, 195 Cal. 711 [235 Pac. 1012]; *Estate of Casarotti*, 184 Cal. 73 [192 Pac. 1085]; *Estate of Collins*, 174 Cal. 663 [164 Pac. 1110]; *Estate of Purcell*, 164 Cal. 300 [128 Pac. 932]; *Estate of Dolbeer*, 149 Cal. 227 [9 Ann. Cas. 795, 86 Pac. 695]; *Estate of Chevallier*, 159 Cal. 161 [113 Pac. 130]; *Estate of Relph*, 192 Cal. 451 [221 Pac. 361].) There remains to consider under this issue the question of the ability of the testator to know or understand his relation to the natural objects of his bounty, and this brings us to a consideration of respondents' claim of insane delusions. [4] This rests solely upon the circumstance that the testator when dictating the terms of the will expressed a belief that his daughter Ellen was addicted to the use of liquor and drugs and stated in effect that the trust provision for her benefit was because of his fear that she would squander the money. The evidence shows that this daughter was neither a drunkard, a drug addict, nor a spendthrift, and it is argued that the will is therefore the product of a delusion which affected the testamentary purpose of the testator. [5] But the existence of a mere delusion, that is to say, a false or mistaken belief concerning the existence of a fact, does not affect testamentary capacity. A delusion to invalidate a will must be an insane delusion, that is to say, a belief which is the spontaneous product of a diseased mind, which comes into existence without reason or evidence to support it and which is adhered to against reason and against the evidence. (*Estate of Scott*, 128 Cal. 57 [60 Pac. 527]; *Estate of Kendrick*, 130 Cal. 360 [62 Pac. 605]; *Estate of Perkins*, 195 Cal. 699 [235 Pac. 45]; *Estate of Allen*, 177 Cal. 668 [171 Pac. 686]; *Estate of Hess*, 183 Cal. 589 [192 Pac. 35]; *Estate of Calef*, 139 Cal. 673 [73 Pac. 539].) There is nothing in the record to indicate that this belief of the testator, mistaken though it may have been, was without reason or evidence or that it was adhered to against reason or against evidence. [6] The finding of testamentary incapacity is not sustained by the evidence.

[7] On the issue of undue influence the charges made against the defendants George and Margaret are many and serious, but the evidence in support thereof is for the most part insubstantial and purely conjectural. That chiefly relied upon by respondents is, when construed, most strongly

in support of the verdict, to the following effect: The daughter Margaret was living with the testator at his home in Pasadena. William also lived in Pasadena, while George and Edward lived in Pennsylvania. There was some ill feeling between Margaret and George on one side and Ellen and William on the other. The testator had eight years previously executed a will by which, after making bequests for masses and a monument, he had divided his estate into six equal parts, one of which was bequeathed to each of his children, except that portion set apart for Ellen was bequeathed in trust to pay the income to her during her life, together with so much of the principal as she might urgently need, with remainder over at her death to the testator's children who might then be surviving. This will remained in the custody of William, who was named therein as executor, but it was believed by the testator to have been lost. Upon several occasions during the few years preceding the execution of the will here under attack, Margaret had expressed an intention of sending for her brother George to have a new will made. In the latter part of January, 1922, when testator was seriously ill, Margaret sent a telegram to George requesting him to come and a letter explaining that their father had some business to attend to, in response to which George and Edward came to California to visit their father. George did not advise his brother William of his arrival in Pasadena and was there about a week before William learned of his presence. While there he assisted his father in the preparation of an income tax return and when he had been there about three weeks George mentioned the subject of a will to his father. Thereupon the father requested George to get a pencil and paper and take notes of the manner in which he desired to leave his property and then to take those notes to the testator's intimate friend, John McDonald, and request the latter to have a will prepared in accordance therewith. This was done and Mr. McDonald turned the notes over to counsel for the First Trust & Savings Bank, of which he was an officer, for the drafting of the will. When this had been done George called at Mr. McDonald's office and procured a copy of the proposed will, which he read to his father paragraph by paragraph, and the latter expressed himself as satisfied therewith. It was then arranged that Mr. McDonald call at

testator's house, bringing with him witnesses for the execution of the will. Before this had been done George left Pasadena upon his return to his home in Pennsylvania and upon the same day after George had departed the testator went alone to Mr. McDonald's office, stating that he had come to execute the will and that he desired to save Mr. McDonald the trouble of bringing witnesses to his house. The will was then again read to the testator in the presence of Mr. McDonald, the latter's son, and his secretary, Miss Christ; was executed in their presence and they signed the same as subscribing witnesses, no one else being present. The three subscribing witnesses were wholly disinterested, and were, in effect, strangers to all of the parties to this litigation, though Mr. McDonald, senior, was and had been for many years an intimate friend of the testator. There is evidence from which it may be inferred that the daughter Margaret knew of the execution of this will and of the nature of its provisions prior to the death of the testator, whereas none of the other children other than George knew that such a will had been executed. This evidence falls far short of showing such undue influence as in effect destroyed the testator's free agency and overpowered his volition at the time of the making of the will (*Estate of Holloway, supra; Estate of Relph, supra; Estate of Newhall,* 190 Cal. 709 [28 A. L. R. 778, 214 Pac. 231]; *Estate of Kilborn,* 162 Cal. 4 [120 Pac. 762]; *Estate of Baird,* 176 Cal. 384 [168 Pac. 561]; *Estate of Morey,* 147 Cal. 495 [82 Pac. 57]; *Estate of Gleason,* 164 Cal. 756 [130 Pac. 872]). Respondents, perhaps realizing this insufficiency, invoke the rule that where one who unduly profits by the will sustains a confidential relationship to the testator and actually participates in procuring the execution of the will, the burden is upon him to show that the will was not induced by coercion or fraud (*Estate of Gallo,* 61 Cal. App. 163, 175 [214 Pac. 496]). **[8]** But the facts of this case do not bring it within the purview of this rule. It may be conceded that Margaret and George sustained a confidential relationship toward the testator. It may be further conceded that Margaret unduly profited by the will, although the fact that she had lived with and constantly cared for the testator throughout the last years of his life would seem to afford a perfectly good reason for his preferment of her. But

there is no evidence that she was active in procuring the execution of the will, or that she participated therein to any extent. There is no evidence that she even knew of the execution of the will until some time thereafter. [9] The circumstances above mentioned of her expressed intention to send for George to have a will made and the fact that she did send for him do no more than give ground for a suspicion that she may have participated in procuring the will to be executed. But a finding to that effect based upon such evidence would be the product of speculation and conjecture. [10] The things done by George in this connection as above related, when measured by the decisions, do not constitute such activity in procuring the execution of the will as to bring this rule into operation (*Estate of Anderson,* 185 Cal. 700 [198 Pac. 407]; *Estate of Morcel,* 162 Cal. 188 [121 Pac. 733]; *Estate of Calef, supra; Estate of Higgins,* 156 Cal. 257 [104 Pac. 6]; *Estate of Lavinburg,* 161 Cal. 536 [119 Pac. 915]; *Estate of Purcell, supra*). [11] Neither can it be said that he will unduly profit from this will. The amount which he will receive under it is substantially the same as he would have received under the will executed in 1914, which is asserted by respondents to have been wholly valid and free from any suspicion of fraud or undue influence. The amount which he will receive under this will is but slightly greater than he would have received had the testator died intestate. Much is said in respondent's brief upon the subject of an unjust and unnatural will and the inference of undue influence to be deduced therefrom. That expression is usually applied in a case where a testator leaves his estate or a large portion thereof to strangers to the exclusion of the natural objects of his bounty without apparent reason therefor. [12] The will here under attack cannot be said to be an unnatural will (*Estate of Packer,* 164 Cal. 525 [129 Pac. 778]). By it the testator made provision for all of the natural objects of his bounty. That he did not provide for them equally is but to say that he exercised his legal right of testamentary disposition instead of leaving his estate to be distributed according to the law of succession. [13] Whether or not the will is unjust is a matter of opinion, as to which we have no right to substitute the opinions of the jurors or of the members of this court for that of the testator. [14] The

evidence discloses that there were reasons present in the mind of the testator for the discrimination against these contestants. Whether those reasons were good or bad was not for the jurors to say and is not for this court to determine.

[15] Upon the issue of fraud contestants made numerous charges of fraudulent misrepresentations of fact alleged to have been made to the testator by Margaret and George for the purpose of inducing him to execute a will favoring them, to the detriment of contestants. At the trial contestants produced no evidence which even tended to substantiate any of those charges. The sole evidence upon which they now rely as supporting the finding of fraud is found in the testimony of George. He testified that when his father was dictating to him the provisions to be included in his proposed will the father expressed a belief that his daughter Ellen was addicted to the use of liquor or drugs. Respondents argue that because George failed to contradict this statement and did not endeavor to disabuse his father's mind of this belief he must be held guilty of fraud. [16] Respondents invoke the rule that "where there exists a relationship of trust and confidence it is the duty of one in whom the confidence is reposed to make full disclosure of all material facts within his knowledge relating to the transaction in question and any concealment of material facts is a fraud." (12 Cal. Jur. 772.) The rule is a sound one but has no application to the situation here in question. Assuming, without deciding, that the situation was such as to make it the duty of George to disclose to the testator any facts of which he had knowledge which would have a bearing upon the provisions to be included in the will, it does not appear that he had any knowledge whatsoever as to the truth or falsity of this belief of the testator. On the contrary, it does appear by uncontradicted evidence that he had not seen nor heard from this sister for six years last past and that he had no knowledge as to whether she was or was not addicted to the use of liquor or drugs. He cannot be held guilty of fraud in failing to disclose facts of which he had no knowledge.

[17] We are not unmindful of the rule that upon a review of the sufficiency of the evidence it must be constructed most strongly in support of the verdict, and, in

cases of conflict, the evidence which tends to support the verdict must be accepted as true and that which conflicts with it rejected, and where conflicting inferences may reasonably be deduced from facts proved those must be adopted which tend to support the verdict. Giving full application to this rule, however, we are of the opinion that the evidence herein is insufficient to support any of the findings in favor of the contestants. The claimed errors of law for the most part resolve themselves upon analysis into the same contention, namely, the insufficiency of the evidence, and do not require separate consideration herein.

The judgment is reversed.

Richards, J., Shenk, J., Seawell, J., Lawlor, J., Lennon, J., and Waste, J., concurred.