[Civ. No. 11311.   First Dist., Div. One.—May 1, 1941.]

ERNEST SANDERS et al., as Executors, etc., Plaintiffs and Appellants, v. EFFIE BRUTON CRABTREE et al., as Executrices, etc., Respondents; MARGARET G. SANDERS, as Administratrix, etc., Intervener and Appellant.

Tanner, Odell & Taft and S. W. Odell for Appellants.

Fogel, Beman & Jones and Leonard A. Shelton for Respondents.

KNIGHT, J.—Ernest and Perry Sanders, as executors of the last will of their grandfather, William H. Sanders, deceased, brought this suit in equity against Margaret E. Sanders, widow of the deceased, and her children by a former marriage, to have property claimed by Margaret E. Sanders as surviving joint tenant, declared the property of the estate and subject to administration. A complaint in intervention was filed by William P. Sanders, son of the deceased and father of the plaintiffs, asking for the same relief. The findings of the trial court were in favor of defendants on all issues; judgment was entered accordingly, and plaintiffs and the intervenor appeal. After the briefs were filed, Margaret G. Sanders, as administratrix of the estate of W. P. Sanders, deceased, was substituted in the place and stead of William P. Sanders, plaintiff in intervention; and Effie Bruton Crabtree, Esma Bruton Johnson, and Margaret K. Hill, as executrices of the estate of Margaret E. Sanders, deceased, were substituted in the place and stead of Margaret E. Sanders, as party defendant; but for convenience the parties will be referred to throughout as if there had been no substitution.

William H. Sanders, the deceased, and the defendant Margaret E. Sanders, were married in New Mexico in April, 1906. They were 51 and 49 years of age respectively at the time of their marriage, and each had been married before. William H. Sanders had one son by a former marriage, William P. Sanders, the plaintiff in intervention; and Margaret E. Sanders (Margaret E. Bruton before her marriage to Sanders) had four children, the three surviving being the other named defendants. Both William H. Sanders and Mrs. Bruton owned property in their own right; and prior to their marriage they entered into a marriage settlement agreement or antenuptial contract, by the terms of which each agreed that his or her separate property should remain separate; that neither should have any claim or right to the property of the other, before or after death; that each should have the right to dispose of his or her separate property by deed, will, or otherwise, and that in the event of death intestate the property of each should descend to his or her direct heirs. The contract further provided that after Sanders' death his widow was to have a life interest in property which Sanders intended purchasing in California as their residence; and that he would by will made after marriage fix an amount suffi-

cient to maintain his widow. This contract was dated April 17, 1906; and two weeks later and after their marriage Sanders made a will, giving his widow a life estate in "all of the property which I may hereafter acquire in the State of California", and providing that she should be paid $50 a month until her death or remarriage. Cash legacies were left to two grandsons (the plaintiffs herein), and all the balance of the property was left to the son, William P. Sanders. The contract and will were delivered to the son; and soon thereafter, that same year, the elder Sanders moved to Santa Monica. The son remained in New Mexico, continuing to take care of his father's and his own interests there. About 1910 the son came to California, where he continued to act for his father, keeping books, collecting rents, assisting in making loans, and generally aiding his father in his business, up to 1920, when their friendly business and personal relations were broken as a result of a dispute over a Madera County ranch, and were never resumed up to the time of William H. Sanders' death. After his death (he committed suicide on June 8, 1934) it was found that during the ten years previous Sanders had created and caused to be created joint tenancies in himself and his wife, covering numerous pieces of property, stock, and bank accounts, valued at $174,172.45. These joint tenancies as to the property he had caused to be created in his own and Mrs. Sanders' names by having the grantors make the deeds, many of them through escrows. He had also created joint tenancies with his grandchildren, children of W. P. Sanders, of the value of $46,828.50; and he left a will dated February 15, 1930, disposing of the balance of his estate, valued at $12,160. In the will he left his widow a life estate in certain property in Santa Monica (including the residence); upon her death said property to be divided between his son and his four grandchildren, one-fifth each. The balance of his property he also willed to his son and his four grandchildren, one-fifth each; and the will provided that any person contesting or attacking it in any way forfeited any bequests thereunder and was bequeathed $1. By the last provision of the will all former wills were revoked, and Ernest and Perry Sanders, grandsons, were appointed executors without bond.

Immediately after the death of William H. Sanders, W. P. Sanders and his son Ernest consulted attorney Fogel. W. P.

Sanders produced the antenuptial agreement and the will of 1906, and according to Sanders, Fogel told him the antenuptial agreement had no force and effect; that the joint tenancies were final and could not be set aside, and that the property was worth approximately $100,000. He also told Sanders he would help obtain a settlement between the parties, but he could not represent Sanders. A list of the properties was compiled, and efforts at settlement were made by the parties submitting propositions, one to the other, through attorney Fogel; and on June 28, 1934, W. P. Sanders, as party of the first part, the grandchildren, as parties of the second part, and Margaret E. Sanders, the widow, as party of the third part, executed an agreement of settlement and a release of their claims against each other. Sanders and his children were represented at this time by attorney Crawford. Thereafter all the properties covered by the agreement of settlement were delivered and paid over by the respective parties; and on June 29, 1934, the executors filed their petition to probate the will, which was admitted to probate on July 27, 1934. On June 18, 1935, a year after the settlement agreement was executed and more than four months after the order admitting the will to probate had become final, Sanders and his children served on Mrs. Sanders notice of rescission of the settlement and release agreement; and this action followed—the complaint being filed September 3, 1935.

Appellants first contend that the antenuptial contract and will of 1906 and their delivery to W. P. Sanders, with the promise that the property should be his on the death of his father, constituted a binding contract made for the benefit of W. P. Sanders, the son, which could not be rescinded without the consent of the son, and that it was never rescinded; that therefore the widow holds the property as trustee for the son as beneficiary under that agreement. We are unable to sustain the contention made by appellants in this behalf.

The agreement provided that as the parties were about to be married they desired to make said contract with regard to the "holding, using and disposition of the property which is now owned by each of them in their individual right as the sole and separate property thereof, together with all of the increase which may accrue thereon during their marriage"; that all of the property of William H. Sanders which was then his separate property "shall, after the said marriage,

continue to be used, managed, controlled, handled, mortgaged, transferred and disposed of by the said party as his sole and separate estate'', together with all of the increase or after-acquired property, and regardless of any change in form, and shall be kept separate from that of Margaret E. Bruton; that Margaret E. Bruton during the life of or after the death of Sanders ''shall have no claim, right or interest or demand of any kind, nature or character'' except as thereafter stated; that Sanders ''shall have the full right to acquire and dispose of either by deed, will or otherwise any and all of the said property'', and in case of his death without a will, all the property shall go to his direct heirs, except to the extent thereafter mentioned; that as to the property which he intended to purchase in California as the residence of the parties, after his death his widow shall have a life interest therein, so long as she lives or remains his widow, and that she shall receive from his separate estate an amount sufficient to maintain her, the amount to be fixed by a will to be made after their marriage, and that such property in the event of her death or remarriage shall descend as the other portions of his estate. The contract then made provisions with regard to the separate property of Margaret E. Bruton similar to those made with regard to the separate property of William H. Sanders—that her separate property shall remain hers, and shall not be co-mingled with his, and shall be managed and controlled by her, and that Sanders shall have no claim of any kind thereon, and in case of her death without a will, shall go to her direct heirs. It concluded: ''In order to fully effectuate this agreement, the parties hereto as above stated, do hereby mutually release any and all rights, interests, claims or demands of whatsoever kind or nature in and to the property held by either of them or to be acquired by either of them during their marriage.''

The following are among the reasons why appellants' contention cannot be sustained. In the first place, it appears upon its face that the contract was not made for the benefit of a third party; and therefore it does not come within the rules relied on by appellants. As shown by its terms, it was simply a marriage settlement contract, intended to limit the parties' interests in each other's property; there is no provision requiring either party to do anything for the benefit of W. P. Sanders, or any third party. William H. Sanders did

not indicate therein that he intended to leave his property to his son; he simply reserved the "full right to acquire and dispose of either by deed, will or otherwise any and all of the said property". This right he exercised first by making the will in favor of his son, and later by the subsequent will and the creation of the joint tenancies with his wife and grand-children. The provision that in case of his death intestate, all the property shall go to his direct heirs (except the life estate reserved in the residence property to his wife), does not give his son any rights here, because the deceased did not die intestate. There is nothing in the actions or statements of William H. Sanders at the time the contract and will of 1906 were executed and delivered to W. P. Sanders indicating a binding contract with the latter that his father's property, with the exception of the life estate in the California property, should ultimately be his. The only testimony to the effect that the father promised the son that the property would be his on the father's death was given by the son, that "he told me many times that when he passed on what he had would be left to me"; but he did not say that his father so promised when he handed him the agreement and the will. And manifestly the promises made by the father to the son did not constitute such a contract as referred to in the cases cited by appellants. As said in one of those cases, *Owens* v. *McNally*, 113 Cal. 444 [45 Pac. 710, 33 L. R. A. 369], "Where a contract such as this, resting in parol and sought to be enforced after the death of the other party to it, comes before a court of equity for review, it is scrutinized, and should be scrutinized with particular care, and only upon a satisfactory showing that it is definite and certain and just will it be enforced. The proofs of the contract should be clear, and the acts of the claimant referable alone to the contract." ■ Moreover, such a contract to be enforcible must be "made *expressly* for the benefit of the third person, not where the third person is or may be merely incidentally or remotely benefited as a result of such contract." (*Buckley* v. *Gray*, 110 Cal. 339 [42 Pac. 900, 52 Am. St. Rep. 88, 31 L. R. A. 862].)

Nor is there any merit in appellants' contention that they are entitled to enforce the contract. This contention is based upon the theory that the contract was made for the benefit of the son, W. P. Sanders, and was never rescinded. There was

a finding made to the effect that there was no cancellation of the contract other than by deceased conveying or causing to be conveyed to himself and his wife, to himself and his grandchildren, as joint tenants with the right of survivorship, to himself as trustee for the benefit of his grandchildren, and to his granddaughter, certain properties, real and personal. But as already pointed out, the contract shows that it was not made for the benefit of the son, and even if W. P. Sanders could enforce performance, there are no provisions to enforce which would give him any rights, nor has he pointed out any. The contract simply provided that William H. Sanders might by will or deed or otherwise do as he saw fit with his property; and his wife agreed that she would waive her community rights therein (she is not asserting any community rights here), and if he died intestate (he died testate) she would not share as one of his heirs at law. It was nowhere agreed or suggested other than the above that William H. Sanders was limited in what he should do with his property.

Appellants further contend that said instruments creating the joint tenancies in the deceased and his wife were never delivered to Mrs. Sanders. It was admitted that the deeds were of record, but appellants contend that the ostensible record title is negatived by the testimony of Mrs. Sanders, which they claim showed she had no knowledge of the instruments, and that the antenuptial agreement intervenes and estops her from claiming a presumptive delivery or acceptance. In this regard she testified in substance that she knew some of the property was in joint tenancy, that "he told me about it" but she "didn't pay enough attention to know anything about it". However, there is no question but that the instruments were duly delivered to and accepted by William H. Sanders; and suffice it to say in this regard that the delivery to and acceptance by one grantee operated as a valid delivery to and acceptance by the other grantee. (*Eshleman* v. *Henrietta Vineyard Co.*, 102 Cal. 199 [36 Pac. 579], cited approvingly in *Smith* v. *Lombard*, 201 Cal. 518 [258 Pac. 55]; 18 Cor. Jur., p. 212; 16 Am. Jur., p. 522.)

The dispute which terminated the friendly relations between the deceased and his son arose in this manner: William H. Sanders, with his son and others, was interested in a trust of properties consisting of a large ranch in Madera County, title to which was in the Hellman Commercial Trust and

Savings Bank as trustee. William H. Sanders owned a 640-acre (2135.5/2942) interest, and the son a 320-acre interest; and the son managed the ranch for the syndicate. On December 19, 1919, the father made an assignment of all his interest in this ranch to the son. About six months later the father approached the son with some buyers for the property, and the son refused to sell, reminding the father that he had assigned all his interest in that property to him. There was a heated discussion, and the son finally agreed to sell, and to give his father $11,000 of the $15,000 down payment, but refused to give him anything further. From that time on the relationship between the father and son was not at all friendly, the father, as found by the court, believing that he had given the property to his son to be held by the son for the use and benefit of the father, and accusing his son of cheating and defrauding him out of said property. The court found that "the belief of William H. Sanders was not an insane delusion", and also found: "Prior to his death, and particularly during the last fifteen years of his life, the deceased, William H. Sanders, had not become debilitated through old age and sickness, or otherwise, to a greater extent than was natural to a strong man of his years. He used intoxicating liquors, and on occasions used them to excess. He did not, during the time mentioned in the plaintiffs' complaint, or at any time, become weakened physically or mentally, or become incompetent to do business, and his mind did not become weakened or unsound. His mind at no time was in such a condition that he was subject to undue influence or persuasion in the transaction of his business, or otherwise."

Appellants contend that the facts show without conflict that "when W. H. Sanders placed in joint tenancy with his wife the property involved in this action he was suffering from an insane delusion that his son, W. P. Sanders, had cheated and defrauded him out of property, and for that reason said W. H. Sanders attempted to dispose of his property in a way he would not otherwise have done", and that the trial court's findings that deceased was not incompetent or acting under an insane delusion, are contrary to the evidence. With this contention we cannot agree. The testimony of the son that at the time his father brought the buyers for the property to him, his father denied having made any assignment of his interest in the property, was contradicted by testimony to the

effect that the deceased knew he had made the assignment to his son, but thought he "was to have all the income as long as he lived". And on the question of whether the deceased's mental condition was impaired by his drinking, the evidence is sharply conflicting; but there is considerable testimony to the effect that his mental condition was never impaired by his drinking, including that of his doctor, who had taken care of him professionally for many years, and who knew him intimately, on one occasion having been on the same boat with him for about three months on a trip around the world, and who testified that in his opinion the deceased was "never incompetent"; that he had positive opinions which could not be easily changed, but he was not suffering from any mental disease—on the contrary, "his mind was much keener than the average man of his age".

In view of all the above, it is our opinion that the trial court's findings that deceased was not incompetent or acting under an insane delusion are amply sustained by the evidence, and cannot be disturbed on appeal. As said in *Estate of Shay*, 196 Cal. 355 [237 Pac. 1079], "The evidence discloses that there were reasons present in the mind of the testator for the discrimination against these contestants. Whether those reasons were good or bad was not for the jurors to say and is not for this court to determine. . . . There is nothing in the record to indicate that this belief of the testator mistaken though it may have been, was without reason or evidence, or that it was adhered to against reason or against evidence. The finding of testamentary incapacity is not sustained by the evidence."

The court also found: "Margaret E. Sanders did not in any manner unduly influence her husband, William H. Sanders, or impose her will upon him; and he did not, relying upon any representation made by her, adopt or consent to a plan of having his properties placed in joint tenancy with his wife, to be held, if she survived him, for the use and benefit of his son and grandchildren and by her distributed to them, but, on the contrary, William H. Sanders placed, or caused said properties to be placed, in joint tenancy of his own free will and volition and with the full intent of vesting the entire fee title of said premises in Margaret E. Sanders at the date of his death, if she survived him." Appellants attack this finding, contending that there is evidence of undue

influence, and in addition, that because of the relationship of the parties, it must be presumed that the properties were obtained without sufficient consideration or by undue influence. Suffice it to say on this point that all of the circumstances of the case, as developed by the evidence, including Mrs. Sanders' testimony that she did not urge her husband to make the joint tenancies, that in fact she only knew of them in a general way, and the evidence showing that deceased felt that his son had cheated him and he was determined that he should not get any more of his property, and that by the terms of the antenuptial agreement he reserved the right to dispose of his property in any way he desired, amply support the trial court's finding in this respect. (*Estate of Shay, supra.*)

The disposition of the above questions would seem to establish without further discussion the validity of the joint tenancy deeds, and consequently Mrs. Sanders' right to the property involved therein; but respondents contend that in any event the compromise agreement, executed by the parties after W. H. Sanders' death, was a valid, binding agreement; and we are of the opinion that the trial court was justified in so holding. By the terms of this settlement, Mrs. Sanders agreed to give W. P. Sanders $5,000 in cash, 350 shares of Southern California Edison stock, $25 a share par value, and the "Barndollar" note and mortgage, balance due $10,000. She also agreed to pay the funeral expenses of her deceased husband and make no claim therefor against the estate; to waive any claim to family allowance; to waive any right to probate homestead; and not to contest the 1930 will or seek to have any former will probated in its place. W. P. Sanders and his children agreed to convey to Mrs. Sanders whatever interest they had in the "Wonder Market" property.

Appellants first contend that they received no consideration for the signing of the agreement because no part of the money paid over to W. P. Sanders or his children was the separate property of Mrs. Sanders, but all belonged to her deceased husband, and therefore they received only what already belonged to them. However, as held above, the joint tenancies under which Mrs. Sanders acquired the property were valid and cannot be set aside; therefore the property did not belong to appellants, but to Mrs. Sanders.

"Plaintiffs' Exhibit 10" contains a list of properties which they claim were not contained in the list of properties supplied by attorney Fogel on which the settlement agreement was based. The properties listed, and their appraised values as fixed by the estate tax return, which by stipulation was introduced as evidence of the value of said properties, are: 3 Mar Vista lots, $2,000, $2,500, and $3,000; Santa Monica property, $1500; Wonder Market property, $15,000; Tower Bonds, $9,500; and 2 promissory notes (Warren, $2,069, and George, $1280). Appellants admit that "There was some error in the descriptions of some of the properties which would reduce this amount considerably but when the notice of rescission was served, the intervenor and his children were laboring under the impression that a very large amount of property had been omitted." And respondents show that the Mar Vista lots were included in the list, and the Tower Bonds were listed as of the value of $18,500 (their face value was $19,000 but they were appraised at $9,500). Respondents admit the Santa Monica property and the Warren and George promissory notes were not included in Fogel's list, the Santa Monica property through inadvertence, and the two promissory notes because they were in escrow and none of the parties knew about them until later. Besides the Wonder Market (which will be discussed later), the total value of the items left off the list was $4,849. It would appear, therefore, as respondents contend, that this discrepancy in an estate valued at over $200,000 was not of such magnitude that had the parties known of these pieces of property they would not have executed the agreement.

The situation as to the Wonder Market was as follows: A note for $27,500 secured by a trust deed on the property was purchased and assigned to William H. Sanders and Perry Sanders as joint tenants. Some negotiations were had between the debtor on the note and W. H. Sanders, and the property was conveyed to Sanders and his wife, and a quiet title action was brought. The findings in the quiet title action, according to the briefs herein, refer to the deed by which the property was conveyed to Sanders and his wife "as joint tenants, with right of survivorship"; but the judgment based on these findings is to the effect that W. H. Sanders and wife were the owners of the property, without any reference to them as joint tenants.

Appellants claim that Perry Sanders had an interest in the property, growing out of the fact that he was once named as joint owner of the note secured by the deed of trust, and that had he known of his interest, he never would have signed the quitclaim deed, part of the settlement agreement. Respondents claim Perry Sanders did know he was joint owner of the note, and there is evidence supporting this claim. On the other hand, if Sanders and his wife be considered as tenants in common, in accordance with the judgment in the quiet title action, rather than as joint tenants as named in the deed conveying title to them, then upon Sanders' death his heirs acquired his half interest therein. ■ But in any event, and regardless of the state of the title to the Wonder Market, it seems clear that by the terms of the settlement agreement all the plaintiffs relinquished whatever interest they or any of them may have had. They agreed therein to convey to Mrs. Sanders "any and all interest which they or any of them may or might have in or to the properties known as the Wonder Market . . . the intention being to convey to Third Party [Mrs. Sanders] all of the interest which they or any of them may or might have in said properties, whether arising through the estate or will of William H. Sanders, Deceased, or otherwise"; and they agreed to execute a quitclaim deed to said property. Thus it would seem that they effectively disposed of any interest they had in said property, however acquired; and in view of the above, obviously they were not unmindful of the Wonder Market property or their possible interest therein when they executed the agreement, even if it was not included in Mr. Fogel's list.

■ The court found in connection with the settlement agreement, and the evidence shows, that there had been no concealment of the extent and value of the properties involved; that said agreement was not signed under any mistake or misapprehension of material facts, and that the plaintiffs had full knowledge of the facts concerning the extent and values of the estate on November 3, 1934, but not until June 18, 1935, did they indicate any dissatisfaction with the settlement agreement; from which the court concluded that the plaintiffs were guilty of laches and had not effectively rescinded the agreement.

The other questions raised by the appeal are either incidental to those already decided, or do not require special

mention. After having fully examined the record and analyzed the points made and authorities cited by the respective parties, we are convinced that the trial court's findings are fully justified and should be upheld.

The judgment is affirmed.

Peters, P. J., and Ward, J., concurred.

A petition for a rehearing was denied May 29, 1941, and appellants' petition for a hearing by the Supreme Court was denied June 26, 1941.