[Civ. No. 11983. First Dist., Div. Two. Mar. 11, 1942.]

Estate of ROSA REISS, Deceased. MOSES JOSEPH REISS, Appellant v. MAX REISS, Respondent.

Mark F. Jones, Sydney Tannen and H. O. Wallace for Appellant.

Swaffield & Swaffield, Kenneth Sperry, Joseph E. Madden and Charles K. Chapman for Respondent.

STURTEVANT, J.—After the death of Rosa Reiss, her son, Moses Joseph Reiss, applied to the trial court for an order admitting to probate the purported will of the decedent. Max Reiss, her surviving husband, appeared and filed a contest. The petitioner answered the contest and the proceeding was heard before the trial court sitting without a jury. The contest was based on the grounds of lack of testamentary capacity, lack of proper execution, and on undue influence alleged to have been exercised by the petitioner.

The trial court made findings in favor of the contestant on all three grounds and caused an order to be entered denying the application of the petitioner. From that order the latter has appealed. We will discuss each of the grounds of contest in the order above stated.

1. The decedent Rosa Reiss and Max Reiss were husband and wife. Rosa had been married twice. Her first husband's name was Katz. They had two sons, the petitioner, Moses Joseph, and a younger brother, Bernard. Both boys took the name of their stepfather. All were natives of Austria but came to America and located in the southern part of this state. At the time of her death Rosa was about sixty-six years of age. For some years she had been afflicted with diabetes. In January, 1934, she suffered a stroke and thereafter was paralyzed on the right side. Her face was distorted, she had little or no use of her right arm, and so little use of her right leg that she dragged it as she walked. Arteriosclerosis commenced to develop at a time prior to the stroke. Her family physician was Dr. L. D. Mahannah. He testified that he commenced to treat her in 1934. ''Her mouth hung slightly open and her face was expressionless. There was not much expression in her eyes. The pupils reacted to light. One eye did not close. I tried to talk to her and it was difficult to carry on a conversation. Her speech was very thick and it was difficult to understand much, and her answers were not logical. I do not think she understood. She spoke slowly. I do not think she had the mental capacity to answer questions. She had no ability to carry on a coherent conversation. This continued to the time of her death. It existed in January, 1935. I made a diagnosis of arteriosclerosis. This is the hardening of the arteries as the different parts of the body do not get enough nourishment. There is not enough nourishment to the brain. There is a consequential effect on the brain making the patient mentally deficient. I have an opinion as to the degree of her mentality. She had the capacity of a six or eight year old child—if that old.''

The petitioner and his wife and Max Reiss and the decedent, all lived at Long Beach. It appears that the residences were not far apart. During the year 1934 the families visited each other at different times. In the latter part of July, or the first part of August, the decedent went to the house of Moses and remained there a few days. During that period

of time Moses took her to his attorneys, Doyle, Clark and Thomas. Mr. Doyle waited on her. He prepared certain conveyances and a will. None of those papers were executed but remained in the possession of the attorneys. After the papers had been prepared the decedent did not return to execute them but did return to her own home and rejoined her husband. A few months later, on January 23, 1935, the decedent again went to Moses' house. The next day he again took her to the office of Mr. Doyle. All of the documents purport to have been signed on that date. If we understand the record correctly, on the afternoon of the same date the decedent again returned to her home. The next day the decedent and her husband called on Mr. Doyle and asked for the return of the papers. They were not returned and litigation followed. On February 26, the decedent was adjudged incompetent and her husband was appointed her guardian. A little later, in the month of March, a petition to restore her to competency was filed by her son Moses. Max Reiss appeared and opposed the petition. The trial court appointed Dr. Victor Parkin and Dr. P. E. Bowers to examine the alleged incompetent and report to the court. The examination was made and a very full report was thereafter made to the court. The petition to restore was denied and the litigation over the above mentioned documents continued. On January 12, 1936, Rosa died. A little later her son Moses sought to have the purported will admitted to probate. On the hearing of the contest the testimony of Dr. Parkin and Dr. Bowers was brought forth by the contestant. It will serve no purpose to state it in detail. However, among other things it may be recited that Dr. Parkin testified: "The arteriosclerosis of Rosa Reiss had affected her mentality in and of itself. I know that arteriosclerosis existed prior to the stroke. Arteriosclerosis could not be cured prior to the paralysis. I am certain she had a stroke of paralysis. I do not think she was much worse in March when I examined her than she was in January, 1935. The changes are too gradual to see. In that short time no noticeable change had taken place." Dr. Bowers testified: "I asked her if she had grown children and she said yes but she did not know how many. She did not know how long she had lived in America nor how long she had lived in California. She said she had had a stroke; she could not

tell what happened; she did not know how long she had been in the hospital; she did not know who was president of the United States, or the mayor of Long Beach, or the governor of California. She said she did not know anything . . . She was in a state of deterioration due to the effect of the disease of the blood vessels of the brain and of the body generally, and to the fact that she had chronic diabetes which also contributed to this condition. She was just an automaton, following the suggestion of anyone at all. She was incompetent, she was deteriorated and mildly demented, and had been so for not less than eighteen months to two years . . . In my opinion Rosa Reiss was so affected; she had a state of chronic mental deterioration from which there was no change or recovery and no lucid intervals. It was a downhill process every day . . . She did not have an acute insanity but she had a dementing process, going down-hill, a mental deterioration; and since there was no recovery from that kind of a condition, then they have no lucid intervals. She was incompetent, demented, deteriorated.''

There was not a particle of testimony by any medical expert in any manner controverting what has been recited above.

Each party called witnesses who expressed opinions as laymen and as intimate acquaintances of the decedent respecting the mental sanity of the latter. Such evidence addressed to the capacity of an automaton of course has little, if any, weight. In this state ''It is well settled that mere proof of mental derangement or even of insanity in a medical sense is not sufficient to invalidate a will, but the contestant is required to go further and prove *either* such a complete mental degeneration as denotes utter incapacity to know and understand those things which the law prescribes as essential to the making of a valid will, *or* the existence of a specific insane delusion which affected the making of the will in question.'' (Italics ours.) (*Estate of Shay,* 196 Cal. 355, 359 [237 Pac. 1079].) In the instant case there is no testimony whatever tying the case to the second class. The testimony was directed wholly to the first class. It is also settled law that ''A testator is of sound and disposing mind and memory if, at the time of making his will, he has sufficient mental capacity to be able to understand the nature of the act he is doing, to understand and

recollect the nature and situation of his property and to remember, and understand his relations to, the persons who have claims upon his bounty and whose interests are affected by the provisions of the instrument." (*Estate of Sexton,* 199 Cal. 759, 764 [251 Pac. 778].) By its findings of fact the trial court found in effect that the mind of the decedent was unsound within the rule just quoted. A most cursory examination of the evidence hereinabove recited discloses that the finding of the trial court was clearly supported.

2. Passing to the claim that there was a lack of proper execution of the will, additional facts should be recited. Max Reiss and the decedent were a frugal couple. They accumulated a large amount of property. Both worked hard to contribute to the accumulation. Some of their funds were invested in real estate and some were in bank deposits. Apparently all stood under joint tenancy agreements. There is evidence that the decedent at times expressed a wish to so arrange her affairs that her share should stand of record in her name. She expressed that wish to the end that she should remain independent and have funds to live on. The record does not disclose a particle of evidence that she ever asked anybody to prepare a will for her. The proponent in numerous places testified that she never mentioned will to him and he did not to her. When she called on Mr. Doyle he expressed the opinion to her that the joint tenancy agreement could be broken by making certain conveyances and he undertook to prepare and cause those conveyances to be made. However, the making of the will arose purely collaterally and, as hereinabove stated, without any request being made by the decedent. A photostatic copy of the instrument is contained as an exhibit in the record. At the end of it there are some scratches in ink where the signature should be. It is quite impossible to say that the two scratches are the writing of Rosa Reiss. That is of the date of January 24, 1935. The same comment is equally applicable to a document written on the same day by Mr. Doyle addressed to Farmers and Merchants Bank and claimed to have been signed by the decedent. Another document written on January 25, 1935, acknowledged before a notary public on the same date, contains a signature that is quite plain and distinct. Another exhibit is a photostatic copy of the signature

of the decedent written on a card when opening a savings bank account on June 30, 1931. That signature is quite plain and quite distinct. Bearing in mind that the trial court had all of the documents before it, and saw and heard the witnesses, we are quite unable to state that said court erred in finding as a fact that the decedent never executed the will.

3. The remaining attack is the assertion that there is no evidence showing the will was made by undue influence exercised by the decedent's son Moses. As shown above it was the contention of Moses in the trial court that his mother never sought to make a will, that he never sought to have her make a will, and that Mr. Doyle never did. However, the evidence is clear that Moses was the son of the decedent, that down to the year 1934 their relations had been agreeable and that in many respects he had acted and was acting as a confidential agent of his mother. At the time the will was written the decedent was a guest in the home of Moses. At the time the will was signed the decedent was again a guest in the home of Moses. On different occasions Moses had taken his mother to different attorneys. Among others he took her to Mr. Doyle. Mr. Doyle was not of her selection, was not her attorney, and there was evidence to the effect that Moses promised to pay Mr. Doyle for his services. After the papers above mentioned were written in August, Moses continued to remain active and obtain data so that Mr. Doyle could draw up legal papers. Just why the papers were not signed in August the record is not clear. However, when the decedent returned to Moses' house in January, he said to Mr. Doyle, "Now is the time, let's go. I don't want to take any more chances." Moses testified to making that statement. His brother Bernard Reiss testified that in January, just before their mother died, Moses said to him, "I fixed it all right. If Max wants as much as four cents he has got to ask me about it, and if there is even a button off a shoe you and I get half of it." Immediately after the funeral, at Moses' house, he told Bernard of the papers that had been signed. Moses' wife interposed, "You know she was not right mentally." Moses answered, "What matters— she signed." Immediately after the papers had been signed by the decedent, and on the same day, she was allowed to leave Moses' home and return to her own home. In presenting his case the proponent never explained any of the foregoing facts. He interposed some denials but the truth of

those denials was properly to be weighed by the trial court. In the case entitled *Estate of Graves*, 202 Cal. 258 [259 Pac. 935], commencing on page 262, the court said: "Three well-established facts, among others, which are recognized as being indicative of undue influence, or a subversion of a decedent's volition, stand out clearly in the record: The relations between appellant and the decedent afforded to appellant an opportunity to control the testamentary act; the decedent's condition was such as to permit of a subversion of her freedom of will; the appellant was active in procuring the instrument to be executed." We think that the instant case falls clearly within the classifications so indicated, and that this court may not say that the trial court erred in making the finding complained of.

The judgment appealed from is affirmed.

Nourse, P. J., and Spence, J., concurred.